BOROUGH OF EAST PATERSON, APPELLANT, v. DEPARTMENT OF CIVIL SERVICE OF THE STATE OF NEW JERSEY AND THOMAS DONOHUE, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 7, 1957—Decided October 14, 1957.

56

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. James A. Major* argued the cause for appellant (*Mr. R. Sery Nicosia,* attorney).

*Mr. David Landau,* Deputy Attorney-General, argued the cause for respondent Department of Civil Service (*Mr. Grover C. Richman, Jr.,* Attorney-General, attorney; *Mr. David M. Salz, Jr.,* Deputy Attorney-General, of counsel; *Mr. Landau,* on the brief).

*Mr. Joseph A. LaCava* argued the cause for respondent Thomas Donohue (*Messrs. Spitz & LaCava,* attorneys).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D.   On May 25, 1956 Acting Chief Bloor of the East Paterson Police Department preferred charges against respondent Patrolman Donohue, alleging that he had on May 24, 1956, while on duty and in violation of the local police ordinance, been under the influence of intoxicating liquor, used indecent, profane and harsh language, and failed to answer radio calls sent to his police car by headquarters.   He suspended Donohue from active duty pending determination of the charges.   The mayor and council then held a hearing, found Donohue guilty as charged and removed him from his position as police officer. He appealed to the Civil Service Commission which, after a hearing *de novo,* found him guilty of the charges but determined that the penalty of removal, in the light of all the circumstances revealed by the testimony, was too severe. It accordingly set the removal aside and reduced the penalty to a 60-day suspension.   The borough appeals.

The borough does not dispute the findings of the Civil Service Commission, nor challenge its statutory power to modify the sentence.   Rather, it attacks the action of the Commission as an abuse of its statutory authority, requiring reversal by this court.

The facts are set out in the comprehensive findings and discussion of the testimony prefacing the conclusion and order of the Civil Service Commission.   Since the Commission found Donohue guilty as charged and he does not cross-claim, we ordinarily would not fully detail the facts. However, their exposition is necessary to establish the back-

ground against which the Commission action is to be appraised.

Donohue was sick with a cold on the morning of May 24, 1956. Before leaving his home to assume his regularly assigned 8 A. M. to 4 P. M. round of duty he took two aspirins, some ammoniated cough syrup, and an ounce of whiskey with lemon and water. His morning police car patrol passed without event; there is no evidence of intoxication or dereliction of duty during that period. During the noon-hour he returned home for lunch, which consisted of a salad and coffee. Since he had no more of the cough syrup he took a teaspoon of elixir terpin hydrate. The doctor who later examined Donohue testified on behalf of the borough that this cough medicine had an alcoholic content of 40 to 42%. Donohue took the medicine bottle, with less than a teaspoonful left, with him when he returned to duty at 1 P. M., and consumed the elixir during the early afternoon. He testified that he reported for duty by making two radio calls to headquarters from his car at that time, which calls were not acknowledged.

The events following lunch were the subject of conflicting testimony. Acting Chief Bloor testified he tried continually to reach Donohue by radio call between 1:55 and 2:40 P. M. —he and the desk sergeant said there were 22 calls made— but without success. He finally got a response at 2:40, but Donohue failed to appear at headquarters. Bloor then went out to look for Donohue and found his radio patrol car parked at a gasoline station. He went into the men's room and found Donohue sitting there, holding his head and in an intoxicated state. He smelled alcohol on Donohue's breath and asked if he had been drinking; receiving a profane and inconclusive reply he ordered Donohue to return to headquarters with the patrol car. Donohue did so without mishap and, according to Bloor, upon arrival let loose a barrage of obscene and profane language and name-calling when asked what was the matter with him.

Bloor then called in an osteopathic physician to examine Donohue. The Commission described the examination as

brief; we would characterize it as cursory. The doctor found Donohue's blood pressure slightly higher than normal, the pulse high normal, the pupillary reflexes slow and sluggish and the respiration count high. Donohue could walk a straight line, but his body swayed a few times. His face was flushed and his speech slurred and abusive. There was a strong odor of alcohol. The doctor did not test Donohue by having him shut his eyes and touch index finger to nose, or fingertips to fingertips. He did not inquire as to whether he was sick or had taken medication. There was no urine test, and Donohue's demand for a blood test was ignored. The doctor concluded that Donohue was under the influence of liquor and it was not safe for him to drive in that condition. Later in his testimony he said Donohue was "slightly intoxicated"; he was "intoxicated, but very mildly." Asked on cross-examination if he did not say after the examination that Donohue was fit for duty, his answer was, "I don't recall that I did." (On depositions he was asked whether he had not told a third person that Donohue was not intoxicated; his reply was, "In talking of the average layman's term of what he considers intoxication, I said no.")

Following the doctor's examination Acting Chief Bloor suspended Donohue from duty for five days "for failing to answer radio and also for drinking while on duty."

The desk sergeant and borough clerk, both of whom were at police headquarters when Donohue reported in, substantiated Bloor's testimony that Donohue used obscene and indecent language toward him. Both were of the opinion that he was under the influence of intoxicating liquor.

Donohue testified that after reporting back to patrol duty at 1 P. M. and receiving no acknowledgment of his two calls to headquarters, he continued his patrol and received no signal until 2:30, when Bloor told him to report to headquarters to deliver a letter for him. Bloor had made no mention of having called him. Donohue said he got a coughing spasm on his way to headquarters and began to gag. He went to the men's room of a nearby service

station, where he was sick at his stomach. As he came out he met Bloor and told him of his illness. According to Donohue, Bloor called him a foul name, accused him of being drunk, and directed that he get into his radio car and follow him to headquarters. Upon arrival there Bloor told him he was suspended for five days for drinking while on duty. Donohue replied that it was a "bum rap" and that Bloor knew he hadn't been drinking on duty, but was sick. Bloor then said he was going to call a doctor to examine him, and when the doctor came in Bloor pointed to Donohue and said he was drunk. After the examination, according to Donohue, the doctor turned to Bloor and said, "This man is perfectly fit for duty." Bloor insisted he was drunk and suspended him for five days, at which point, Donohue says, "I blew my top. We got into a terrific argument." He said Bloor cursed at him; when asked whether he cursed back, he replied, "I probably did. I don't remember. I was very angry." Donohue testified he told Bloor that his job had been in jeopardy since May 10 preceding; he said, "You have been gunning for me ever since. Proof of that is that you tried to suspend me yesterday. * * * You changed your mind. Today you are making it stick." He demanded a blood examination, and it was refused.

Donohue claimed there was bad feeling between Bloor and himself, resulting from his having issued a traffic summons for speeding to the borough police commissioner on May 10 preceding. He described how Bloor and the commissioner had importuned him to withdraw the ticket; they had put him under considerable pressure to do so, but he refused. He persisted in that refusal despite the commissioner's threat that "Some day you are going to be very sorry that this happened"—ever since which time, according to Donohue, the acting chief had been hostile toward him. To further substantiate Bloor's hostility, Donohue charged that Bloor had accused him of once hitting his daughter. This conversation was corroborated by another policeman.

On cross-examination Bloor had said he had always been

friendly with Donohue. He denied he had ever accused him of hitting his daughter, or asked him to quash a traffic ticket he had issued to the police commissioner. He also denied being the first to use indecent and profane language when Donohue returned to headquarters, or that he had threatened Donohue with suspension the day before, May 23.

Donohue also testified to Bloor's attempt to suspend him for five days on May 23, the day preceding the suspension in question, for failing to call in from a police box every hour, as ordered. The attempted suspension was withdrawn when Donohue proved it had not been possible to open the police box.

As for his failure to answer the radio calls sent out by the acting chief and desk sergeant, Donohue testified that up to the time he received the 2:30 P. M. call to return to headquarters he thought the radio was all right. There was considerable testimony by Donohue and other policemen that radio reception was not good at times. There were "dead spots" in various areas of East Paterson. Further, because the police radio system was on the same frequency as the Port of New York Authority, tugboat calls often interfered with police signals. A number of policemen corroborated this line of testimony, which was not contradicted.

Bloor admitted that before May 24 police cars were not required to report in at regular intervals, nor were they logged. There were no established regular routes for patrol cars. It was not until after May 24 that specific reporting procedures were inaugurated and the police department established and used a radio frequency of its own.

Donohue vigorously denied he was drunk at any time on May 24. The gas station attendant testified that Donohue was not intoxicated when he entered the station. Several policemen stated that Donohue was not under the influence of liquor when at headquarters, and a number of others corroborated Mrs. Donohue's testimony that her husband was not intoxicated when he came home after being suspended. Two of the officers also testified that Bloor was given to cursing and the use of profane language toward policemen.

We need touch upon only one additional fact, and that is that Donohue had served on the East Paterson police force for 4½ years without blemish on his record. One police sergeant said that Donohue was a "very conscientious" policeman; "He is one of our best."

This, then, is the factual record which was exposed to the Commission for its consideration. The borough does not deny that the Commission had the power to modify the sentence imposed by the mayor and council, but bases its claim of error simply on the fact that both bodies found Donohue guilty of the charges, and to allow him to continue on the East Paterson police force would be destructive of discipline and morale. It can discern nothing in the Commission's findings that would justify his retention as a police officer. This approach to the issue over-simplifies the problem. It implies that the Commission could look only to the acts allegedly committed, and not to any extenuating circumstances or to facts which would indicate possible bad faith on the part of Acting Chief Bloor and the borough governing body.

*N. J. S.* 11:2A–1 provides that no municipal employee "shall be suspended, fined, demoted for a period of greater than thirty days in the aggregate in any one year or discharged without the same right of appeal to the commission, which shall have the same power of revoking or modifying the action of such authority, as in the case of removal as provided in sections 11:15–2 to 11:15–6 of the Revised Statutes. * * *" Upon appeal by a removed employee, the Civil Service Commission is required publicly to inquire into and hear the person sought to be removed. *R. S.* 11:15–4. Such inquiry or hearing "shall be for the purpose of fairly determining whether the employee involved, by reason of his act as charged and his record of service, merits continuance therein or should be removed therefrom or otherwise disciplined for the good of the service." *R. S.* 11:15–5. Within 15 days after the completion of the inquiry or hearing, the Commission is to render its decision, and the statute expressly provides that it may "when in its judgment the

facts warrant it, modify or amend the penalty imposed by the appointing authority or substitute another penalty for that imposed, * * *." *R. S.* 11:15–6.

Appeals before the Civil Service Commission are, of course, conducted as hearings *de novo*. *Newark v. Civil Service Commission,* 114 *N. J. L.* 406, 413 (*Sup. Ct.* 1935). This court, in *Dutcher v. Department of Civil Service,* 7 *N. J. Super.* 156 (*App. Div.* 1950), a case directly on point, had occasion to review the history of the above statutes. After referring to the provisions of *R. S.* 11:15–6 giving the commission the power, "when in its judgment the facts warrant it," to modify the penalty imposed by the appointing authority or substitute another penalty in its stead, we said:

"* * * This statutory provision specifically empowers the Commission to exercise 'its judgment,' in the light of the factual situation revealed by the testimony, to determine whether the penalty of the appointing authority shall be approved or modified. The Commission's determination should not be set aside unless it appears that it was not reasonably supported by competent evidence or that it was arbitrary or capricious. The presumption arises that the order made is a reasonable and valid exercise of the authority legislatively conferred upon the Commission and the burden of establishing the contrary is upon him who asserts it. *State Board of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504 (*E. & A.* 1935). * * *" 7 *N. J. Super.* at *page* 162.

That case, like the one before us, involved the vacating by the Commission of an order of dismissal and substituting a three months' suspension in its place. What was said in *Dutcher* serves to guide us in reviewing the Commission action here under attack.

The Commission, in the present case, held an independent hearing and determined the merits on the testimony taken before it, as was its duty. *Newark v. Civil Service Commission,* above, at *page* 411. The Commission there vacated the dismissal of a patrolman and ordered him reinstated with pay. In that case the municipality and its public safety director argued that since the police officer had pleaded guilty to one of three charges leveled against him, the Commission was without authority to disturb the

conviction; that reinstating the officer after his plea of guilty was contrary to orderly procedure and made it impossible for the director of public safety to carry out the responsibilities of his office and to perform the duty he owed the public of protecting it from imposition and of enforcing proper and strict discipline in the department. What was said in *Newark* adequately answers the contention made by the borough in this case, that affirmance of the Commission decision would be destructive of all discipline and morale. The court stated:

"It seems to us that prosecutor's argument, on this point, appears to be directed or addressed to the policy or the wisdom of the clear provisions of the Civil Service act, rather than to the powers therein conferred upon the commission. Obviously, with such an argument we are not presently concerned. For its validity, as well as its operation in conjunction with other pertinent municipal acts, as herein pointed out, is firmly established. * * *" 114 *N. J. L.*, at *page* 412.

Although this court undoubtedly has the power to review the Commission's action and, if necessary, make independent findings thereon, *R. R.* 4:88–13, 1:5–4(*b*) and 2:5, it will not substitute its judgment for that of the Commission where there is proof to support the latter's action and its judgment is not arbitrary, capricious or unreasonable. *Dutcher v. Department of Civil Service,* above, 7 *N. J. Super.* at *pages* 162–163. Where the Commission has acted within the authority granted to it by statute and has sought to further the legislative policy, the rule that its action will generally not be upset on judicial review unless there is an affirmative showing that such action was arbitrary, capricious or unreasonable, is to be given "sympathetic sweep." See *Rogers v. Department of Civil Service,* 17 *N. J.* 533, 541 (1955); and *cf. Carls v. Civil Service Commission,* 17 *N. J.* 215, 221 (1955); *Falcey v. Civil Service Commission,* 16 *N. J.* 117, 123 (1954). As to the presumption of reasonableness attaching to an administrative agency's action, see *Elizabeth Federal S. & L. Ass'n. v. Howell,* 24 *N. J.* 488, 508 (1957), citing the *Dutcher* case.

The problem with which the Civil Service Commission dealt on Donohue's appeal was not an unfamiliar one, as evidenced by reported cases and certain other police officers' appeals called to our attention in the borough's brief and at the oral argument. The Commission brought to its evaluation of the testimony and its modification of the removal penalty an experience and expertise in these matters which is the hallmark of its administrative function. In testing whether the action of the Commission in reducing the penalty to a 60-day suspension was proper, we need only ask whether that action was reasonable in the light of all the testimony and circumstances.

In prescribing the lighter penalty the Commission undoubtedly must have found mitigating factors in the record before it. Among them we discern the following:

(1) The unrefuted testimony showing that before the incident leading to his discharge Donohue had a perfect record and was regarded as an excellent police officer. Indeed, his devotion to duty was such that he did not hesitate to give a traffic summons to his own police commissioner for a serious traffic violation, and refused to reconsider his action despite strong pressure that he do so. The statute, *R. S.* 11:15–5 authorizes the Commission to consider the employee's record of service.

(2) Bloor was undoubtedly hostile toward Donohue, in all probability because of the traffic ticket incident and because Donohue allegedly had hit his daughter. Bloor, as already noted, denied that he had ever accused Donohue of striking his daughter or asked him to quash the ticket.

(3) The Commission had before it testimony of Bloor's abortive attempt to suspend Donohue for five days on the day preceding the suspension in question.

(4) There was the conflicting testimony relating to the traffic ticket issued to the police commissioner, and the pressure put on Donohue to withdraw it.

(5) Although the Commission found that the charge of being under the influence of liquor while on duty was sufficiently supported in the proofs, it went no further after

reviewing the conflicting testimony (including that relating to Donohue's illness and taking of medicine, the brief physical examination given him by the doctor, and the testimony of those police officers who saw him at headquarters and later in the afternoon), than to say that Donohue was "at least to some extent" under the influence of intoxicating liquor. It was not dealing with a case of aggravated drunkenness, but one that had been described by the doctor as very mild intoxication.

(6) In passing on the profanity charge, the Commission found ample proof to indicate that Donohue did use improper language, but it went out of its way to note that the acting chief was in the habit of using profane and indecent speech and should be admonished by the governing body. We do not discern in this any excusing of Donohue for having countered Bloor's alleged profanity with colorful language of his own, but detect a feeling on the part of the Commission that Donohue was not totally to blame in what must have been a hotheaded exchange of obscenities and profanities.

(7) Although Donohue was found guilty on the charge of failing to answer radio calls, the Commission carefully noted, if not stressed, the extensive testimony given by police officers that at times they did not get good reception on the police radio, there were "dead spots" around the borough, and the tugboat radio-casting would regularly break in on the signal. That there was substance to this testimony is indicated by the fact that after May 24 the police department instituted a system of radio car reporting procedures and changed to a frequency of its own.

(8) There was the uncontradicted fact that Acting Chief Bloor suspended Donohue instanter for no more than five days. (This was in excess of his authority, because the power of suspension lay only in the governing body, which explains why Bloor on the next day preferred formal charges to be heard by the mayor and council.) We note two things, as must have the Commission: (1) When Bloor suspended Donohue on May 24 the reasons he assigned in his entry on the police blotter were "for failing to answer radio and

also for drinking while on duty." Nothing was said about Donohue having been under "the influence of intoxicating liquor," the language used by Bloor in making his formal charges after he had consulted the borough council. That charge is completely different from "drinking while on duty." Nor was there any reference on the police blotter to the use of "indecent, profane and harsh language," which was the subject matter of the third charge formally preferred by Bloor the next day. (2) It is significant that Bloor, responsible for the discipline and morale of the police department and, acting in discharge of a mistaken authority, considered Donohue's conduct no more serious than to deserve a five-day suspension penalty. He reaffirmed on cross-examination that if the power were his, he would have given him only five days.

We also take note of two facts not stressed in the record, but which are nonetheless present. One is that the police commissioner to whom Donohue had issued the traffic ticket was a member of the governing body which found him guilty. The second is that after the incident Bloor was advanced from acting chief to chief.

The traffic ticket incident in itself, the bad blood existing between Bloor and Donohue, as well as the fact that Bloor formulated the charges in the manner he did after discussion with the borough council, place in question not only the good faith of the acting chief, but also the good faith of the borough council in assessing the penalty for the offenses. This consideration of *bona fide* action on the part of the municipality is an essential part of the Civil Service Commission's reviewing function, with respect to the issues of both guilt and penalty. In *Weaver v. Department of Civil Service*, 6 *N. J.* 553 (1951), the dismissed township employee was held to be entitled to a hearing before the Commission to determine whether or not his dismissal was a penalty imposed because of his political convictions, and not a *bona fide* attempt to effect municipal economies. An even stronger holding to the same effect was made in *Devine v. Plainfield*, 31 *N. J. Super.* 300 (*App. Div.* 1954). There the Commission refused a hearing to a policeman who was

dismissed at the end of his probationary period, on the ground that no authority existed for such review. This determination was reversed, the court concluding that appellant should be given the opportunity to present before the Commission evidence on the question of bad faith by the municipality.

The Commission, of course, had the distinct advantage of observing Bloor and Donohue on the witness stand. There is sufficient in the record from which it could conclude that the severity of the penalty imposed upon Donohue was directly or indirectly related to the incident with the police commissioner which had occurred only a short time before, as well as to the hostile attitude of the acting chief.

We find that the action of the Civil Service Commission in modifying the penalty of dismissal was a reasonable exercise of its statutory authority, supported in the record. The borough has not discharged its burden of establishing that this action, presumptively reasonable, was not a valid exercise of the authority legislatively conferred upon the Commission.

It is of interest to compare the 60-day suspension substituted by the Commission in place of the removal penalty, with the action taken by our Supreme Court in *City of Asbury Park v. Department of Civil Service,* 17 *N. J.* 419 (1955), where the court, in exercise of its original jurisdiction, reinstated a municipal determination of a six-months' suspension upon a finding a policeman guilty of conduct unbecoming a police officer, in circumstances far more serious than those before us.

The order of the Civil Service Commission is affirmed.