131 N.J. Super. 125 (1974)
328 A.2d 653
TOWNSHIP OF CHERRY HILL, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, YOUTH CENTER, INC., A CORPORATION OF THE STATE OF NEW JERSEY, AND KEIM & KEIM, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS,
v.
NEW JERSEY RACING COMMISSION, NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, AND GARDEN STATE RACING ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY, JOINTLY SEVERALLY, OR IN THE ALTERNATIVE, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided November 6, 1974.
*130 Mr. Ralph J. Kmiec for plaintiffs (Messrs. Kmiec & Palumbo, attorneys).
Mr. Clinton E. Cronin for defendant New Jersey Racing Commission (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
Mr. Andrew F. Zazzali for defendant New Jersey Sports and Exposition Authority (Messrs. Zazzali & Zazzali, attorneys).
Mr. George H. Hohweiler for defendant Garden State Racing Association. (Messrs. Richman, Berry, Ferren, Hohweiler & Tyler, attorneys).
RIZZI, A.J.S.C.
This is a mixed in lieu proceeding and action to enjoin a public nuisance in which the issues to be determined are:
(I) Whether a joint permit issued by the New Jersey Racing Commission (Commission) to the New Jersey Sports *131 and Exposition Authority (Authority) and Garden State Racing Association (Garden State) to conduct a thoroughbred race meeting at the premises in Cherry Hill of Garden State during the period November 25, 1974 through December 31, 1974 was issued in violation of N.J.S.A. 5:5-43.
(II) Whether the Authority statute, N.J.S.A. 5:10-7(a) prohibited the Authority from operating a thoroughbred racing meet in a place other than the "Meadowlands Complex";
(III) Whether N.J.S.A. 5:5-47 provides for an unconstitutional delegation of legislative power for the lack of adequate, reasonable and clear standards to guide the Commission in authorizing the transfer of racing days from one permit holder to another.
(IV) Whether there has been a denial to plaintiffs of equal protection under the United States Constitution because the revenue received by the State of New Jersey from racing operated by the Authority is limited to .05% under N.J.S.A. 5:10-7(f), while the revenue received from other permit holders in the conduct of racing is 9.15% under N.J.S.A. 5:5-66;
(V) Whether the conduct of horse racing at the premises of Garden State of Cherry Hill during the period November 25, 1974 through December 31, 1974 will constitute a public nuisance, and if in the affirmative, whether such public nuisance is actionable such as to require the issuance of an injunction thereon;
(VI) Whether the action of the Commission in granting the joint application to the Authority and Garden State to operate throughbred racing at the premises of Garden State at Cherry Hill should be set aside as arbitrary, unreasonable and capricious.
Defendant Authority is a body corporate and politic established by N.J.S.A. 5:10-1 et seq., which became effective on May 10, 1971. Under date of May 24, 1972 the Authority, pursuant to the authority of N.J.S.A. 5:10-7, applied to the Commission for a permit to conduct the running *132 of horse race meetings at the site of the "Meadowlands Complex" in East Rutherford. Thereafter, the Authority commenced the construction of recreation facilities on the land described in the statute, which construction is continuing and will include a thoroughbred horse race track among other facilities. In June 1972 the Authority had been advised by the Commission that a permit to conduct horse racing was approved, and an official permit was issued by the Commission on April 27, 1973.
By letter dated August 16, 1974 the Commission urged the Authority to apply to it for a permit to conduct a meeting for a portion of its available racing dates in 1974 at the facilities of a licensed permit holder in New Jersey, presumably under the authority of N.J.S.A. 5:5-47. Sometime thereafter there was a joint application filed by the Authority and Garden State for permission to conduct a meeting at the track of Garden State during the period November 25, 1974 through December 31, 1974.
On September 24, 1974 the Commission held a meeting at its offices at Trenton to which representatives of Cherry Hill, including the mayor, had been invited at their request, and after hearing the opposition of the mayor expressed at the meeting to the issuance of the permit and the reasons therefor, the Commission proceeded to grant the joint application to operate racing at Garden State.
This proceeding was thereafter instituted by the plaintiffs seeking to void the permit granted for the various reasons above enumerated, and also seeking to enjoin defendants, if the permits were otherwise declared to be valid and effectual, from exercising the permit, upon the ground that the conduct of racing at the premises of Garden State in Cherry Hill during the days in question will constitute an actionable public nuisance.
The various legal questions with respect to the validity of the joint permit will first be considered.

*133 I
Plaintiffs charge that the grant by defendant Racing Commission of the challenged license is void because it is in violation of N.J.S.A. 5:5-43. It has been established that the joint application of the Authority and Garden State was not filed until September 20, 1974.
N.J.S.A. 5:5-43, insofar as relevant to plaintiffs' argument, provides that:
All applications for dates for horse race meetings after the first year shall be filed with the commission prior to October 15 of each year and shall be acted upon by the commission at a meeting of the commission to be held not later than December 1 of the same year. At such meeting so held the commission shall act upon all applications filed with it prior to October 15 of such year and shall allot to the respective applicants, subject as hereinbefore and hereinafter stated, racing days for the ensuing year. * * *
The argument goes that the Authority did not file its joint application prior to October 15, 1973; therefore, it is asserted, the application is untimely and should have been denied by the Commission.
N.J.S.A. 5:5-43, however, goes on to provide that
* * * In the event any such application is filed with the commission on or after October 15 of any year, the commission shall act upon the same at a meeting of the commission to be held not later than 60 days following the filing of such application; * * *.
While plaintiffs urge this portion of the statute to be inapplicable to the type of joint application under review, it is clear to the court that the language of the statute authorizes the very application here involved.
In the case of applications filed before October 15 of any year, the Commission is directed to act thereon at a meeting to be held not later than December 1 of the same year, by allotting to the respective applicants racing dates for the ensuing year. Thus an applicant to be afforded an opportunity to obtain desired racing dates for the following year must have applied by October 15. Failure to timely file does *134 not result in forfeiture of the right to be licensed at all, but only forfeits the right to compete with other applicants for favored dates, since presumably they already will have been allotted among those who filed before October 15.
The second portion of the statute was calculated, then, to authorize the tardy filing of an application by an applicant for dates, whether in the current year or for the following or ensuing year. If this were not a proper construction of the statute, a new track which may not have received its approval or may not have completed its facilities until, for example December 15, would be denied the right to operate at all during the ensuing year, even though there were many available dates during the ensuing year, for the technical reason that its application was not filed by October 15. Such a strained construction would reach a result which in this courts view was not intended by the statute.
The court is of the view that the application in question falls within the provisions of the second portion of the statute providing for the filing of a late application and that the Commission had a right and indeed the duty to act thereon within 60 days, with the full right to grant the application if otherwise appropriate to do so.

II
Plaintiffs next urge that defendant Commission exceeded its powers in granting the joint license because the right of the defendant Authority to hold a license is limited under N.J.S.A. 5:10-7(a) to the "Meadowlands Complex," and since the license here is to run races at a track other than on the grounds of the Meadowlands, plaintiffs say the statutory authority has been exceeded.
The statute which created defendant Authority limited, in section 6 thereof, its power to a "project to be located in the Hackensack Meadowlands upon a site not to exceed 750 acres." N.J.S.A. 5:10-6(a).
*135 N.J.S.A. 5:10-7(a) provides:
The authority is hereby authorized, licensed and empowered to apply to the Racing Commission for a permit or permits to hold and conduct, as part of the meadowlands complex, horse race meetings * * * and to provide a place or places on the race meeting grounds or enclosure for wagering * * *. [Emphasis added]
Another section of the statute creating the Authority, N.J.S.A. 5:10-22, says that "It is the express intent of the Legislature that the powers of the authority to undertake the meadowlands complex shall be limited to the site of the project * * *."
Plaintiffs urge that the combined effect of these statutory references is to make clear that the Legislature did not intend to allow the Authority to share with other racing license holders the right to operate, under N.J.S.A. 5:5-47, at a track of another license holder.
N.J.S.A. 5:5-47 provides that:
* * * The commission may in its discretion authorize a permit holder to conduct the horse race meeting for which it has been issued a permit, or a portion thereof, at a place, track or enclosure owned or operated by another permit holder upon application therefor made by both said permit holders, subject to such terms, conditions, and requirements as the commission shall direct * * *.
There is no provision in the statute establishing the Authority, N.J.S.A. 5:10-1 through 26, which expressly prohibits racing elsewhere. The issue to be decided, then, is whether the various statutes read together prohibit such activity, or conversely, whether the statutes may be read to inferentially permit racing elsewhere.
N.J.S.A. 5:10-7(a) hereinabove set forth in its germane content merely describes the location for which the Authority had the right to seek a permit. Once the permit was issued to the Authority, N.J.S.A. 5:10-7(b) came into play. It provides that
Except as otherwise provided in this section, such horse race meetings and parimutuel wagering shall be conducted by the authority *136 in the manner and subject to compliance with the standards set forth in P.L. 1940, C. 17 (C.5:5-22, et seq.) and the rules, regulations and conditions prescribed by the Racing Commission thereunder for the conduct of horse race meetings, and for parimutuel betting at such meetings.
The above section, N.J.S.A. 5:5-22 et seq., then, controls the actual conduct of horse meetings after the original application is made and permit issued under N.J.S.A. 5:10-7(a).
Although N.J.S.A. 5:10-22 does limit the acreage of the Meadowlands Complex and thereby guarantees there will be no further infringement by the Authority in the Meadowlands, it is the view of this court that the Legislature did not intend that the Authority must at all times during its existence and under all circumstances conduct its racing on the specified tract. It must be mentioned here that the Legislature, in N.J.S.A. 5:5-47.1, provided that
In the event that any licensed race meeting cannot be held or completed at the time prescribed by the license for the holding thereof, because of the occurrence of an event beyond the permit holder's control, such as a fire, hurricane, tornado or other catastrophe, the permit holder shall be entitled to an emergency permit to hold or complete the said race meeting at any other available race track, upon such terms and conditions as shall be fixed by the New Jersey Racing Commission.
If the Authority had constructed its race track and the stadium were destroyed by catastrophe, such as a fire, applying the reasoning ascribed to the statutes by plaintiffs, the Authority could not avail itself of N.J.S.A. 5:5-47.1 and operate at another track temporarily while its facilities were reconstructed. This result is in the view of this court an unreasonable construction of the statutes and would produce a result never intended by the Legislature. It is more cogent to infer that when the Legislature adopted N.J.S.A. 5:10-7(b) which made the Authority subject to the rules and regulations of the Commission after it came into being, it intended that all of the provisions which established rights as *137 well as obligations as to the other race tracks equally applied to the Authority. It is concluded by this court then that N.J.S.A. 5:10-7(a) is a limitation only upon the application for the original permit to race and not a limitation as to the use by the Authority of the permit itself, and further, that the Authority derived the same right to operate elsewhere under N.J.S.A. 5:5-47 and 5:5-47.1 as did the other permit holders who have been licensed by the Commission. The permit granted under the joint application is valid and effective.

III
Plaintiffs next contend that the provisions of N.J.S.A. 5:5-47 are an unconstitutional delegation of legislative power for the lack of any adequate, reasonable and clear standards to guide the Commission in authorizing the transfer of racing days from one permit holder to another.
N.J.S.A. 5:5-47 in its challenged portion provides that
* * * The commission may in its discretion authorize a permit holder to conduct the horse race meeting for which it has been issued a permit, or a portion thereof, at a place, track or enclosure owned or operated by another permit holder upon application therefor made by both said permit holders, subject to such terms, conditions, and requirements as the commission shall direct. * * *
In the case of State v. Seligson, 106 N.J. Super. 329 (App. Div. 1969) it was held that
* * * [T]he Legislature may not vest unbridled or arbitrary power in the agency but must furnish reasonably adequate standards to guide it.
In Seligson the court went on to hold that such standards need not be expressly stated in a particular section of the statute if they may reasonably be inferred from the statutory scheme as a whole, citing Schierstead v. Brigantine, 20 N.J. 164, 169 (1955).
*138 In Schierstead the Supreme Court held that
In ascertaining the presence of standards and norms to support delegated powers, it is fundamental that we are not confined to the four corners of the particular section under consideration but are obligated to examine the entire act in the light of its surroundings and objectives. Nor need the standards be set forth in express terms, if they may reasonably be inferred from the statutory scheme as a whole.
An examination of other sections of the racing statute, specifically N.J.S.A. 5:5-38 through 51, will disclose numerous requirements for the filing of applications, renewal permits and revocation and refusal of licenses. One of these sections, N.J.S.A. 5:5-43, proscribes that:
* * * In making such allotment of racing dates, the commission shall endeavor to allot to each applicant * * * the dates requested * * *, after giving due consideration to all factors involved and the interests of such respective applicants and the public.
There have been numerous cases in New Jersey in which standards similar to the guiding language of N.J.S.A. 5:5-43 have been upheld. See Burton v. Sills, 53 N.J. 86, 90-92 (1968) ("the public health, safety and welfare"); Elizabeth Federal S. & L. Ass'n v. Howell, 30 N.J. 190, 194 (1959) ("in the public interest"); In re Greenville Bus Co., 17 N.J. 131, 135 (1954) ("necessary and proper for the public convenience and properly conserves the public interests"); Ward v. Scott, 11 N.J. 117, 123-125 (1952) ("without substantial detriment to the public good"); Newark v. New Jersey Turnpike Auth., 7 N.J. 377, 383-385, (1951), app. dism. 342 U.S. 874, 72 S.Ct. 168, 96 L.Ed. 657 (1951) ("which it may determine is reasonably necessary"); State v. Seligson, 106 N.J. Super. 329, 332-333 (App. Div. 1969) ("commodities"); Department of Health v. Owens Corning Fiberglas Corp., 100 N.J. Super. 366, 383-384 (App. Div. 1968), aff'd 53 N.J. 248 (1969) ("air pollution").
*139 It is the view of the court that the racing statute taken in its entirety contains a constitutionally sufficient standard, as delineated in N.J.S.A. 5:5-43 to govern the Racing Commission's action in granting permits and allotting dates under N.J.S.A. 5:5-43 and N.J.S.A. 5:5-47.

IV
Plaintiffs next argue that there has been a denial of equal protection of the laws under the United States Constitution to the people of the Township of Cherry Hill because under the Authority statute N.J.S.A. 5:10-1 et seq., the State of New Jersey will receive as revenue, out of the total betting handle collected by the Authority in the running of horse races, a sum limited to .05% of the total handle, while the running of races by other permit holders results in the collection of revenue by the State under N.J.S.A. 5:5-66(b)(1) on the total handle in the amount of 9.15% thereof.
Legislation carries with it a strong presumption of constitutionality. The United States Supreme Court has held in such cases as McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) and Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436, reh. den. 393 U.S. 898, 89 S.Ct. 65, 21 L.Ed.2d 185 (1968), that state economic or social legislation which results in some degree of inequality is not violative of the Equal Protection Clause of the Fourteenth Amendment, unless the classification involved has no underlying facts or rationale which would reasonably justify it.
The New Jersey Supreme Court held in Guill v. Mayor, etc., of Hoboken, 21 N.J. 574 (1956) that
The classification satisfies the constitutional test of equality and reasonableness if it rests upon same ground of difference having a real and substantial relation to the basic object of the legislation or some relevant consideration of public policy. [at 582]
*140 In New Jersey Sports and Exposition Auth. v. McCrane, 119 N.J. Super. 457 (Law Div. 1971), aff'd 61 N.J. 1 (1972), the general constitutionality of the Authority statute was upheld by both tribunals. In the lower court opinion Judge (now Justice) Pashman made specific note that
The Authority is a public corporation constituted for a public purpose. It is not a private association or entity. Thus, any revenue it receives from its operations and which it utilizes in furtherance thereof is revenue received by a state agency "for the support of government." [119 N.J. Super. at 502]
Applying the test of McGowan v. Maryland, supra, to the alleged inequality of this case, it is clear that our Legislature intended that the Authority as a public corporation be assisted via the medium of extra income in its goal of providing general recreation to the people of the State. Obviously, the ultimate goal of public recreation, not just in racing but in many other areas, reasonably justified the differences in the taxing system between the private permit holders and the Authority.
The court has also considered all other arguments alleging a denial of equal protection but is of the view that the statute in so providing a disparity of taxation is nevertheless constitutional in all respects..

V
The next argument of plaintiffs to be considered is that there will be an actionable public nuisance that will ensue if the permit holders are allowed to conduct a horse race meeting in Cherry Hill from November 25, 1974 through December 31, 1974, and that an injunction should therefore be issued restraining all of the defendants from exercising any rights acquired through the issuance of the joint permit. Defendants assert by way of defense that although some inconvenience will be suffered by various citizens of Cherry Hill by the conduct of racing during the period in question, such inconvenience does not measure up to the existence of *141 a public nuisance. Defendants further argue that even if the court were to find to be present a public nuisance, it would not be actionable or enjoinable because the conduct of horse racing by a permit holder is a legislatively authorized activity.
Plaintiffs and defendants offered proofs over a period of many days dealing with the claim of public nuisance. These proofs established that the Garden State race track is located at the heart of the Township of Cherry Hill, a community of 70,000 inhabitants spread over 24 square miles. The track itself is located on 250 acres of land at the intersection of State Route 70 and Haddonfield Road, a county highway. This intersection is actually a traffic circle known as the Grove Street Circle. Besides Route 70, the major roads in Cherry Hill in the track vicinity are State Route 38, State Route 41 (also known as Kings Highway) State Route 154 (also known as Brace Road) County Road 544 (also known as Haddonfield Road) and certain other county roads known as Chapel Avenue and Church Road, all of which surround the Garden State Race Track. All of these roads are heavily travelled during the day and are especially so during the homeward bound peak hour of 5 to 6 P.M. Besides the Grove Street Circle, there is another major traffic intersection known as the Ellisburg Circle which is located along Route 70 about two miles east of the Grove Street Circle and where Route 70, Route 41 and County Road 544 intersect. Route 70 at the race track is a triple lane highway and from the Grove Street Circle to Ellisburg Circle and beyond in an easterly direction is a dual highway. Route 38 is a three-lane highway running somewhat parallel to Route 70 which, with Route 70, shares the burden of traffic moving between Cherry Hill and the cities of Philadelphia and Camden where thousands of motorists using these highways are employed. Philadelphia also supplies more than half of the daily attendance at the track.
During the afternoon hours of nonracing days these major circle intersections are not traffic controlled but the Cherry *142 Hill police make periodic observation of traffic flow, and where major congestion becomes imminent, foot patrols are enlisted to maintain a manual flow. During racing days these circle intersections are controlled by Cherry Hill police on a regular basis. Other intersections adjacent to the track, including the exits, are traffic controlled by New Jersey State Police. These police details commence immediately after the last race and continue until regular traffic flow resumes and the track parking is substantially emptied, usually about 1 1/2 hours later.
During racing days in the spring of 1974 the number of automobiles which parked on the official parking lot of the track varied between a February weekday low of about 3000 to an April weekday high of about 5000. Saturdays ran about 50% higher than weekdays. Many other automobiles of course found parking in adjoining private lots and spaces. The pattern of attendance indicated quite conclusively that much less attendance could be anticipated during the colder days of the year.
Statistics produced by the secretary to the Racing Commission indicated the daily average attendance at Garden State had dropped considerably between the years 1963 and 1974. In 1963 the daily average paid count was 19,926 while in 1974 the paid daily average had reduced to 12,654. There was credible testimony that the average automobile brought 2.4 persons to the track. There was also credible testimony that the proposed 31-day meeting in late November and December would produce average daily attendance of 8500 to 9000 patrons, much less than prior averages because of two reasons: (1) the colder days of late November and December will itself result in declining attendance and (2) the running of competitive horse racing at the new Keystone Race Track outside of Philadelphia during the same period of time would cause a sharp decline in attendance at Garden State. At 2.4 persons per auto, 9000 persons would produce 3750 automobiles a day.
*143 Many days were spent by the court in hearing testimony from both sides concerning the various traffic counts and studies that had been made from time to time during various months in 1974 and prior, and the projected count of automobiles that might be expected on the various highways surrounding the track during the month of December.
There was credible expert testimony that during December there would be some buildup of traffic on these highways as the Christmas holidays approached because of the location of Cherry Hill Mall, a major shopping mall with two department stores and some 100 smaller stores, located at the intersection of Route 38 and Haddonfield Road, about a half-mile from the race track.
From all of the testimony present there is little doubt that there will be significant additional traffic that will exist on the highways surrounding the track for the 1 to 1 1/2-hour period following the last race. There was testimony that because of Standard Time and the earlier sunset in December, the last race would be required to go off by 4:30 P.M. in order to be run under visible conditions. The evidence indicated that on these roads the peak homeward bound traffic was reached between 5 and 6 P.M. Thus, this race track traffic would pour into the highways partially during these peak hours, with a 4:30 P.M. race track close. There was testimony that a 3:30 to 4:00 P.M. close would result in a much reduced traffic collision between the race goers' vehicles and those of the commuters. It was established that most of the commuters would be travelling on Routes 70 and 38 in an easterly direction, returning from Camden and Philadelphia, while more than half of the race track traffic would be going in a westerly direction back toward Philadelphia. There was testimony that the biggest traffic problems occurred at the Ellisburg Circle, about two miles east of the track along Route 70, where that road intersected with State Route 41 and County Road 544, where it was necessary after the last race of past meets for traffic to be manually directed by three *144 Cherry Hill police. With the presence of the police, traffic was kept moving fairly fluidly even during peak hours.
It was further established by defense expert testimony that notwithstanding the expected commuter rush between 4 to 5 P.M. and 5 to 6 P.M., there was still room during those hours for some 4000 automobiles to exit the track parking lot onto the three major highways, Route 70, Route 38 and Haddonfield Road, and still maintain a movement of traffic, albeit with the aid of police at key intersections to keep traffic moving at a moderate pace. Indeed, the movement of traffic would, in the view of the court, be no worse than has been existent during the past racing sessions at Garden State over a period of many years.
Plaintiffs assert that all of these described conditions of the highways would cause such a slowdown or stoppage of traffic as to compel the court to conclude that a public nuisance would thereby be created and the court is asked to enjoin the defendants from the running of horse races during the 31 days between November 25 and December 31, 1974 in order to abate the anticipated public nuisance.
In 66 C.J.S. there will be found the following definition of a nuisance:
§ 1. Although the term "nuisance" has been regarded as incapable of precise definition, so as to fit all cases, it has also been held to be a term with a well defined legal meaning, and in legal phraseology applies to that class of wrongs which arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real or personal, or from his own improper, indecent, or unlawful personal conduct, working an obstruction or injury to a right of another, or of the public, and producing material annoyance, inconvenience, discomfort or hurt.
§ 2. Nuisances are often classified either as public or private or both. A nuisance is common or public where it affects the right enjoyed by citizens as part of the public * * *.
In 58 Am. Jur. 561 the following definition appears:
A public nuisance has been defined as the doing of or the failure to do something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, *145 or injury to the public, and as a nuisance which causes hurt, inconvenience, or damage to the public generally, or such part of the public as necessarily comes in contact with it in the exercise of a public or common right.
In the case of Lieberman v. Saddle River Tp., 37 N.J. Super. 62 (App. Div. 1955), the court held that the mere maintenance of a Little League baseball field for the enjoyment of juvenile players was not a nuisance per se. The opinion noted that
The trial judge resolved that the plaintiffs had failed clearly and convincingly to prove that the alleged annoyances are so material and substantial in character, * * * as to require the extraordinary relief prayed for by the plaintiffs. Our examination of the record does not incline us to overthrow that conclusion.
Applying these definitions of public nuisance to the traffic conditions anticipated during the critical period here, this court is of the view that while there will be some degree of inconvenience to commuters who are on these highways when the track traffic spills onto the highways, conditions will be no more critical than they have been during many days of past racing seasons. Such conditions would not be so material or substantial in character as to amount to a public nuisance such as to authorize here the extraordinary remedy of an injunction.
Plaintiffs, in charging a public nuisance, assumed the burden of establishing their cause of action by clear and convincing evidence. They have failed to so establish an anticipated public nuisance and their complaint thereon for injunction as well as for damages must fail.
Defendants assert that even if the activity at the track would constitute a public nuisance, an injunction could not issue because the conduct of horse racing is a legislatively authorized activity and hence not enjoinable. This argument goes that the New Jersey Legislature has authorized horse racing in New Jersey, N.J.S.A. 5:5-22 et seq.; the Legislature has authorized racing by one permit holder at the track *146 of another, N.J.S.A. 5:5-47; the Legislature has authorized racing by the New Jersey Sports and Exposition Authority, N.J.S.A. 5:10-1 et seq., and finally, the Racing Commission, pursuant to all of this legislative authority, has issued the appropriate permits to the Authority and Garden State to operate.
Our Chancery Division has dealt with this issue in Borough of Westville v. Whitney Home Builders, 32 N.J. Super. 538 (1954). In that case the State Department of Health had authorized the construction of a sewage disposal plant which was later said by plaintiff to be a public nuisance. In denying the requested injunction Judge Haneman (later Justice of the Supreme Court) held that
Even though it be admitted, for the sake of this motion alone, that the construction and operation of a sewage disposal plant, as approved by the Department of Health, would constitute a public nuisance, the plaintiffs are without remedy before this court. The Legislature has seen fit to make the commission of such a public nuisance lawful and has placed the sole power to permit and control such a public nuisance within the jurisdiction of the State Department of Health. The Legislature has the power to make lawful, so far as the public is concerned, a work or business which by common law would otherwise be a public nuisance. Garrett v. State, 49 N.J.L. 94, 693 (Sup. Ct. 1886).
Where, as here, the Legislature has authorized the State Department of Health to approve the discharge of effluent from a sewage disposal plant into a stream in this State, even though the discharge of said effluent would, under common law, be deemed a public nuisance, it does not constitute such a public nuisance. [at p. 544]
This ruling was not involved in the appeal of the same case, reported in 40 N.J. Super. 62, at 68 (App. Div. 1956).
In 58 Am. Jur.2d, § 228 at 831, the following comment appears:
Generally, the courts will not hold conduct to constitute a nuisance where authority therefor exists by virtue of legislative enactment, and there are numerous statements in the cases to the effect that although it otherwise would be one, the doing of that which the law authorizes cannot be a nuisance, or such a nuisance as will give a common-law right of action.
*147 It is the view of this court that, even assuming plaintiffs had established an anticipated public nuisance, such nuisance would not be actionable because the Legislature had seen fit to authorize the Commission to issue the permit here for a period covering any time of the year, including the time period in issue, subject only to the limitations of N.J.S.A. 5:5-43. Since horse racing at Garden State is an authorized legislative activity there cannot be an actionable public nuisance.

VI
This leads the court to the last cause of action of plaintiffs to be discussed, namely, that the action of the Racing Commission at its meeting of September 24, 1974 in granting the joint permit to the applicants was arbitrary, capricious or unreasonable.
It should be noted here that while ordinarily a review of the action of a state agency is by appeal directly to the Appellate Division, R. 2:2-3(a)(2), the decisions of the New Jersey Racing Commission are specifically reviewable by a proceeding in lieu of prerogative writ as prescribed by N.J.S.A. 5:5-60.
While the action of an administrative agency is presumed to be valid, Elizabeth v. Sullivan, 125 N.J. Super. 569 (App. Div. 1973), the reviewing court has the power to review the Commission's actions and, if necessary, make independent findings thereon, although it will not substitute its judgment for that of the Commission where there is proof to support the Commission action and its judgment is not arbitrary, capricious or unreasonable. East Patterson v. Civil Service Dept., 47 N.J. Super. 55, 65 (App. Div. 1957).
Applying these concepts to the facts here, this court is of the view that while there was ample reason for the Commission to grant the disputed joint permit to race at Garden State during the time period of November 25, 1974 to December 31, 1974, the Commission in the pursuit of its responsibilities had the duty to determine whether terms or *148 conditions should have accompanied the issuance of the permit. At the hearing on September 24, 1974 conducted by the Commission, Mayor Holden of Cherry Hill offered a written statement as well as an oral presentation in which he brought to the attention of the Commission the probable traffic snarls that would ensue. His statement in evidence asserted that "the business community is clearly liable to suffer especially this Christmas season. The prospect of massive traffic jams from one end of Cherry Hill to the other will drive shoppers away from our local stores * * *." The mayor went on in his statement to bring to the Commission's attention that the traffic circle problems would cause great cost to the township for which he was asking state relief. Much of this cost according to the evidence was involved in the furnishing of police details on control traffic at the two circles as well as at other intersections near the track during the racing season.
It is the view of this court that there was a duty on the Commission to give its earnest consideration to the position of the Township of Cherry Hill. It had the right and duty to investigate the problems by resting the issuance of the permit conditioned upon whatever requirements it deemed to be just and appropriate. Indeed, this was conceded by defense counsel at argument. There also was testimony from the secretary of the Racing Commission that on occasions in the past permits had been issued with conditions attached.
This court then is of the view that the Commission should have acted in two areas: (1) it should have considered the imposition of a cut-off time for the running of the last daily race, and (2) it should have determined whether extra traffic police needed to keep traffic moving before and after the races should be provided for or paid by the permit holders.
Ordinarily the court would be loathe to enter into fact-finding responsibility in reviewing the action of a state agency but rather would remand to the agency with direction to consider the evidence and make appropriate findings. However, since time does not permit such action here, this court *149 prefers to assume the duty of making these findings, as authorized by East Patterson v. Civil Service Dept., supra.
All of the evidence that was considered in this case by the court, although not establishing a public nuisance, leads the court to find that on week-days during the period in question the addition of race track traffic to the commuter and holiday traffic on the highways and circles near the track will create a substantial slowdown of traffic. Some of the problems can be minimized by an early closing hour for the track. The heaviest hour of commuter traffic on week-days is that between 5 and 6 p.m. About 1 to 1 1/2 hours is needed to empty the track parking lot. Plaintiffs proofs showed that a closing time between 3 P.M. and 3:30 P.M. would most effectively reduce the impact of vehicles leaving the track.
N.J.S.A. 5:5-84 provides that racing may not commence before 12 noon. There was defense testimony that nine races were contemplated, spaced one-half hour apart. Further testimony indicated that a start of 12:30 P.M. was planned. This would project a ninth race starting time of 4:30 P.M. However week-day traffic is such that evacuating the track parking lot just after 4:30 P.M. would create the greatest traffic problems because much of it would join the 5 to 6 P.M. commuter peak. There was defense testimony from the secretary of the Commission that when attendance at any track meet was low, the time between races was reduced to as little as 25 minutes. If the first race commenced at 12 noon and nine races were spaced 25 minutes apart, the last race could be scheduled at 3:20 P.M. Even if emergency problems caused a delayed start, the last race would be run by 3:30 to 3:45 P.M. This would result in the earlier departure of track patrons and would cause most of the parked cars to leave before the 5 o'clock peak. All of these findings apply to weekday racing. Since there were no special Saturday or holiday problems established, other than expected shopping traffic, there would appear to be no reason why any special closing should apply to those days.
*150 As to the police problem, there is proof that the township supplied an average of 12 police officers on each racing day during the track exit period, in addition to State Police on duty at the track exits. These township officers were on duty at the two circles and at various other intersections near the track. Before the opening of races the township supplied an average of five police officers on each racing day in addition to State Police. None of these locations required traffic details on nonracing days. The township was reimbursed for the salaries of some of these men, and others were assumed by the township. The court finds, however, that since their traffic duties are occasioned solely by reason of track traffic, the township should be entitled to total reimbursement for these expenses. This applies both to entrance costs as well as exit costs for such number of men as the Director of Public Safety shall determine to be necessary.
It is the view of the court that the action of the Commission was unreasonable in not having provided conditions to accompany the issuance of the joint permit. These conditions should have been that:
(1) The last race on every week-day shall be scheduled for not later than 3:30 P.M., and in the event of an emergency condition that shall require an extension, such race may commence up to 3:45 P.M., but not thereafter.
(2) The permit holders shall reimburse the Township of Cherry Hill for all police salaries involved with respect to the handling of traffic at the circles and other locations where needed both before the races and after the races on all days of racing, including weekdays, Saturdays and holidays, during the period November 25, 1974 to December 31, 1974.
This court therefore orders and directs that the joint permit issued to defendants Garden State and Authority be amended so that it will be subject to the two conditions above prescribed.
No costs to any of the parties.