**SOUTH CAMDEN CITIZENS IN ACTION, Geneva Sanders, Pauline Woods, Barbara Pfeiffer, Julita Gilliard, Oscar Lisboa, Phyllis Holmes, Gwen Peterson, Latoya Cooper, Julio Lugo, Lula Williams, and Sharon Christie Potter, Plaintiffs,**

v.

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and Bradley M. Campbell, Commissioner of the New Jersey Department of Environmental Protection, in his official capacity, Defendants,**

**and**

**St. Lawrence Cement Co., L.L.C., Defendant–Intervenor.**

**Civil Action No. 01–702.**

United States District Court, D. New Jersey.

April 16, 2003.

487

Olga D. Pomar, Esq., South Jersey Legal Services, Inc., Camden, NJ, Jerome Balter, Esq., Michael Churchill, Esq., Public Interest Law Center of Philadelphia, Philadelphia, PA, Luke W. Cole, Esq., Center on Race, Poverty and the Environment, San Francisco, CA, for Plaintiffs, South Camden Citizens in Action, Geneva Sanders, Pauline Woods, Barbara Pfeiffer, Julita Gilliard, Oscar Lisboa, Phyllis Holmes, Gwen Peterson, Latoya Cooper, Julio Lugo, Lula Williams, and Sharon Christie Potter.

Peter C. Harvey, Esq., Acting Attorney General of New Jersey, Stefanie Brand, Esq., John M. Van Dalen, Esq., Deputies Attorney General, R.J. Hughes Justice Complex, Trenton, NJ, for Defendants, the New Jersey Department of Environmental Protection and Bradley M. Campbell, Commissioner of the New Jersey Department of Environmental Protection.

Brian S. Montag, Esq., Catherine A. Trinkle, Esq., Mary E. Storella, Esq., Kathryn E. Tagliareni, Esq., Kirkpatrick & Lockhart, LLP, Newark, NJ, for the Defendant–Intervenor, St. Lawrence Cement Co., LLC.

OPINION

ORLOFSKY, District Judge.

**TABLE OF CONTENTS**

I. Introduction .......... 489

II. Procedural History .......... 489

III. Legal Standard Governing Motions to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6) .......... 493

IV. Discussion .......... 493
A. Intentional Discrimination under § 601 of Title VI and the Equal Protection Clause .......... 493
B. Unlawful Discrimination under the Fair Housing Act .......... 499
1. Have the SCCIA Plaintiffs Stated a Claim under § 3604(a) of the Fair Housing Act? .......... 500
2. Have the SCCIA Plaintiffs Stated a Claim under § 3604(b) of the Fair Housing Act? .......... 502
C. Nuisance .......... 503
1. Have the SCCIA Plaintiffs Stated a Claim of Private Nuisance? .......... 503
2. Have the SCCIA Plaintiffs Stated a Claim of Public Nuisance? .......... 506

V. Conclusion .......... 508

## I. INTRODUCTION

Approximately two years ago, South Camden Citizens in Action, and the individual Plaintiffs who reside in a South Camden, New Jersey neighborhood, known as "Waterfront South," asked this Court to issue a preliminary injunction enjoining the construction and operation of a proposed cement grinding facility, which they claimed would have a disparate impact on the residents of their community in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1. Since then, the boundaries of Title VI jurisprudence have been narrowed well beyond what was initially thought to be appropriate by this Court. As observed by Edmund, the protagonist in Shakespeare's *King Lear* who met an untimely demise, "The wheel is come full circle." [1] With this lawsuit now before this Court for the second time, I must consider the Defendants' motions to dismiss Plaintiffs' remaining claims pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiffs' remaining claims are: (1) intentional discrimination in violation of both § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 42 U.S.C. § 1983 and the Fourteenth Amendment (First and Third Counts, Second Amended Complaint); (2) discriminatory impact on the basis of race, color, and national origin in violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.* (Fourth Count, Second Amended Complaint); (3) Private Nuisance and Public Nuisance against the Defendant–Intervenor, St. Lawrence Cement Co., LLC only (Fifth and Sixth Counts, respectively, Second Amended Complaint).

This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343. It also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. I have considered the submissions of the parties and decided Defendants' motions on the papers without oral argument pursuant to Fed.R.Civ.P. 78. For the reasons set forth below, I shall grant in part and deny in part the Defendants' motions to dismiss.

## II. PROCEDURAL HISTORY

This is the third published opinion I have filed in the course of adjudicating the claims asserted by Plaintiffs, South Camden Citizens in Action and the individual residents of a community located in South Camden, New Jersey, known as "Waterfront South" [2] (collectively, "the SCCIA Plaintiffs"), that Defendants, New Jersey Department of Environmental Protection ("NJDEP") and NJDEP Commissioner Robert Shinn ("Shinn"), now Bradley M. Campbell ("Campbell") (collectively, "the NJDEP Defendants"), *inter alia,* violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), by granting Defendant–Intervenor, St. Lawrence Cement Co.'s ("SLC"), application for air permits to operate a proposed cement grinding facility without considering the potential adverse, disparate impact of their permitting decision on the residents of "Waterfront South," an impoverished and largely minority neighborhood in Camden, New Jersey. *See South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.,* 145 F.Supp.2d 446 (D.N.J.2001) (Orlofsky, J.) ("*SCCIA I*"); *South Camden Citizens in Action v. New Jersey Dep't of*

1. William Shakespeare, *King Lear,* Act V, Scene III.

2. Those residents include the individual Plaintiffs, Geneva Sanders, Pauline Woods, Barbara Pfeiffer, Julita Gilliard, Oscar Lisboa, Phyllis Holmes, Gwen Peterson, Latoya Cooper, Julio Lugo, Lula Williams, and Sharon Christie Potter.

*Envtl. Prot.,* 145 F.Supp.2d 505 (D.N.J.) (Orlofsky, J.) ("*SCCIA II* "), *rev'd, South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.,* 274 F.3d 771 (3d Cir.2001), *cert. denied,* — U.S. —, 122 S.Ct. 2621, 153 L.Ed.2d 804 (2002). The basic facts underlying the SCCIA Plaintiffs' claims are set forth in great detail in this Court's earlier Opinions, and will only be repeated here when necessary to provide context. A brief recitation of the procedural history, however, is warranted to explain the current procedural posture of this case.

On February 13, 2001, the SCCIA Plaintiffs moved for a preliminary injunction and declaratory relief against the NJDEP Defendants. In their original verified Complaint, the SCCIA Plaintiffs alleged that the NJDEP Defendants violated Title VI and the regulations promulgated by the United States Environmental Protection Agency ("EPA") to implement Title VI when the NJDEP issued air pollution control permits to SLC to operate a cement grinding facility without regard to the discriminatory effect it would have on their neighborhood, Waterfront South, an impoverished, minority community located in South Camden, which was already suffering from the cumulative environmental effects of the numerous industrial facilities situated in and around it. On February 22, 2001, I signed a consent order which permitted SLC to intervene as a defendant in this action. *See* Consent Order (filed Feb. 22, 2001).

Subsequently, on April 19, 2001, I granted the SCCIA Plaintiffs' motion for a preliminary injunction and declaratory relief. In doing so, I relied on controlling case law in this Circuit which held that a private right of action existed under § 602 of Title VI, *see Powell v. Ridge,* 189 F.3d 387 (3d Cir.), *cert denied,* 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999). I determined that, *inter alia,* SCCIA had established a reasonable likelihood that the operation of the proposed cement grinding facility which would emit various pollutants and require the annual ingress and egress of nearly 80,000 delivery trucks would have an adverse, disparate impact on the residents of the Waterfront South neighborhood based on their race, color, or national origin. *SCCIA I,* 145 F.Supp.2d at 495.

Five days later, on April 24, 2001, however, the United States Supreme Court decided the case of *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), in which a five justice majority held that: "Neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602." *Id.* at 293, 121 S.Ct. 1511. In response to the Supreme Court's decision in *Sandoval,* which effectively overruled this Court's decision rendered five days earlier, the SCCIA Plaintiffs argued that my decision of April 19, 2001, which granted preliminary injunctive relief, could stand on alternative legal grounds. In particular, the SCCIA Plaintiffs maintained that their claim of disparate impact, originally brought under § 602 of Title VI, could be properly brought under 42 U.S.C. § 1983 ("§ 1983"). On April 26, 2001, I granted the SCCIA Plaintiffs' motion for leave to amend the complaint to seek to enforce Title VI's disparate impact regulations pursuant to § 1983.

Thereafter, after considering the supplemental briefs filed by the parties, on May 10, 2001, in a Supplemental Opinion and Order granting the SCCIA Plaintiffs preliminary injunctive and declaratory relief, I held that the EPA's Title VI implementing regulations, codified at 40 C.F.R. §§ 7.1 *et seq.,* created rights which are enforceable under § 1983. *See SCCIA II,* 145 F.Supp.2d at 548. After concluding that

the EPA's § 602 implementing regulations have the force and effect of law under governing Supreme Court and Third Circuit case law, *see id.* at 526–29, I then applied the three-part analysis set forth in *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), in order to determine whether those implementing regulations conferred a federal right on the SCCIA Plaintiffs which was enforceable under § 1983. Keeping in mind that "the EPA's implementing regulations must be examined in the context of the broader legislative and regulatory initiative mandated by Congress through the Civil Rights Act in general, and Title VI in particular, of which the EPA's implementing regulations are but a small part," *id.* at 356, I first held that the SCCIA Plaintiffs had satisfied the first prong of the *Blessing* test by articulating a specific right under the EPA's Title VI implementing regulations, namely, "to be free of disparate impact discrimination caused by the use, by a recipient of federal funds, of 'criteria or methods' which have a discriminatory 'effect' on individuals based on their race, color, or national origin." *Id.* at 538. Moreover, under the second prong of the *Blessing* test, I held that "the right to be free of discrimination resulting from the adverse disparate impact of a facially neutral policy implemented by a recipient of federal funding is neither vague, nor, amorphous, and well within the competency of the judiciary to enforce." *Id.* at 541. Finally, under the third prong of the *Blessing* test, I held that the mandatory language of Title VI, and the EPA's implementing regulations in particular, unambiguously imposed a binding obligation on the recipient of federal funding. *Id.* at 541–42. Having rejected Defendants' argument that EPA's Title VI implementing regulations create a comprehensive enforcement scheme which demonstrates that Congress intended to prohibit plaintiffs from pursuing a remedy under § 1983, I held that the Defendants had failed to overcome their burden to show "by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Id.* at 543 (quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 520–21, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)).

In a divided two to one decision, the United States Court of Appeals for the Third Circuit disagreed, and on December 17, 2001, reversed this Court's Opinion and Order of May 10, 2001, granting preliminary injunctive relief, and remanded the case for further proceedings. *See South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.,* 274 F.3d 771 (3d Cir.2001), *cert. denied,* 536 U.S. 939, 122 S.Ct. 2621, 153 L.Ed.2d 804 (2002). Judge Greenberg, writing for a two judge majority, held that the EPA's Title VI implementing regulations, by themselves, did not create rights which are enforceable under § 1983. *Id.* at 790–91. Rather, Judge Greenberg held that the alleged right of which a plaintiff claims to have been deprived must be found in the statute itself. Judge Greenberg observed: "It was of paramount importance that Congress intended to create such a right in the statute, with the regulation then defining the right that Congress already conferred through the statute." *Id.* at 788.[3] The

3. The dissenting judge, Judge McKee, opined that the Third Circuit's controlling decision in *Powell v. Ridge,* 189 F.3d 387 (3d Cir.), *cert. denied,* 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999), established that § 1983 did indeed provide an independent avenue to enforce disparate impact regulations promulgated under § 602. *See South Camden Citizens in Action,* 274 F.3d at 793–97. "[T]he majority's opinion can not withstand scrutiny given *Powell,* as well as other cases that were not overruled by *Sandoval.* I believe that the district court was clearly correct in concluding that plaintiffs can demonstrate a 'reason-

Supreme Court denied certiorari on June 24, 2002, *see South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 536 U.S. 939, 122 S.Ct. 2621, 153 L.Ed.2d 804 (2002).

Following the remand to this Court, the SCCIA Plaintiffs filed a motion for leave to file a Second Amended Complaint. In an Order dated November 19, 2002, I granted the SCCIA Plaintiffs' motion, and on November 26, 2002, the SCCIA Plaintiffs filed a Second Amended Complaint, which added Lulu Williams and Sharon Christie Potter as plaintiffs, substituted as a defendant the current NJDEP Commissioner Bradley M. Campbell ("Campbell") for former NJDEP Commissioner Schinn, and most importantly, added Counts Five and Six, which asserted claims of Private and Public Nuisance against SLC only. *See* Pl.'s Second Amended Compl. The Second Amended Complaint now includes six counts. The First Count contains a claim that the NJDEP Defendants have intentionally discriminated against Plaintiffs and other African–American and Hispanic residents of Waterfront South in violation of § 601 of Title VI. *Id.* ¶¶ 99–102. The Second and Third Counts allege claims against the NJDEP Defendants of disparate impact and intentional discrimination in violation of the EPA's implementing regulations promulgated to enforce § 602, § 1983, and the Equal Protection Clause of the Fourteenth Amendment. *Id.* ¶¶ 103–13. The Fourth Count alleges that by granting permits to SLC, the NJDEP "has caused a diminution on both the quantity and quality of available housing stock in the Waterfront South neighborhood, which has a discriminatory impact on the Waterfront South residents on the basis of race, color and national origin" in violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.* ("Title VIII"). *Id.* ¶¶ 114–19. Finally, the Fifth and Sixth Counts alleged claims that SLC has created a public and private nuisance to the residents of Waterfront South through the operation of its cement grinding facility, and "through the associated use of diesel trucks[, which] has caused dust, soot, vapors, fumes, and fumes to be emitted." *Id.* ¶¶ 120–37. Accordingly, the SCCIA Plaintiffs ask this Court to grant declaratory relief in the form of rescinding the air permits and certificates which NJDEP issued to SLC, enjoining the NJDEP from taking further action which will permit the operation of SLC's cement grinding facility, and ordering the NJDEP "to develop and adopt comprehensive protocol[s] for reviewing permit applications that will prevent the granting of permits that have the effect of discriminating against persons on the basis of color, race, or national origin." *Id.* ¶¶ (2)-(6).

On January 31, 2001, both the NJDEP and SLC filed motions to dismiss the SCCIA Plaintiffs' Second Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6). In light of the Supreme Court's holding in *Sandoval* and the Third Circuit's recent holding in this case, the SCCIA Plaintiffs concede that their claims of disparate impact in violation of the EPA's implementing regulations under § 602 of Title VI and § 1983 should be dismissed. Accordingly, I shall grant the NJDEP Defendants' motion to dismiss the Second Count of the Second Amended Complaint, as well as that portion of the Third Count of the Second Amended Complaint that alleges a violation of § 602 of Title VI. I shall, therefore, address Defendants' motions with respect to the remaining claims: (1) intentional discrimination in violation of both § 601 of Title VI and the Fourteenth Amendment; (2) discriminatory impact on the basis of race, color, and national origin

able probability of success' on the merits." *Id.* at 799.

in violation of the Fair Housing Act, Title VIII; and (3) Private and Public Nuisance.

## III. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mruz v. Caring, Inc.,* 39 F.Supp.2d 495, 499 (D.N.J.1999) (Orlofsky, J.). The issue is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Rule 12(b)(6) authorizes a court to dismiss a claim on a dispositive issue of law. *See Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Dismissal under the rule cannot be based on a judge's disbelief of a complaint's factual allegations. *Id.* at 327, 109 S.Ct. 1827. When considering a Rule 12(b)(6) motion, courts must accept as true the allegations in the complaint and its attachments, as well as all reasonable inferences construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). Legal conclusions offered in the guise of factual allegations, however, are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

A party seeking dismissal under Fed. R.Civ.P. 12(b)(6) cannot rely on matters outside the pleading because, if these are not excluded by the court, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(c). Although a district court may not consider matters extraneous to the pleadings, "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997); *see also* Fed.R.Civ.P. 10(c); *U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002).

## IV. DISCUSSION

### A. INTENTIONAL DISCRIMINATION UNDER § 601 OF TITLE VI AND THE EQUAL PROTECTION CLAUSE

The SCCIA Plaintiffs first allege that the NJDEP Defendants, "who are the recipients of federal financial assistance and subject to the requirements of Title VI, intentionally discriminated against the plaintiffs and other African–American and Hispanic residents of Waterfront [South] and the adjoining communities on the basis of race, color, and national origin" in violation of § 601 of Title VI. Second Amended Compl. ¶ 101.[4] Section 601 of Title VI

4. Specifically, the SCCIA Plaintiffs contend that the evidence of intentional discrimination can be found in the following thirteen allegations set forth in the Second Amended Complaint:

a. The DEP and Commissioner Shinn [now Campbell] knew that the residents of Waterfront South and the surrounding neighborhoods were predominately African–American and Hispanic.

b. The DEP and Commissioner Shinn [now Campbell] knew that the siting of the SLC facility in Waterfront South would have an adverse impact upon these

provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. In addition, the SCCIA Plaintiffs allege that by intentionally discriminating against them on the basis of race, color, and national origin, the NJDEP Defendants violated the Equal

African–American and Hispanic residents.

c. The DEP and Commissioner Shinn [now Campbell] choose to use the NAAQS and related environmental standards as the criteria for determining whether a permit should be issued, knowing that such a limited analysis could not reveal that the permitting of the SLC facility would create a discriminatory impact on plaintiffs.

d. The DEP and Commissioner Shinn [now Campbell] refused to conduct a disparate impact analysis because they contended that the operation of this facility would not have any negative impact upon the Waterfront South community.

e. The DEP and Commissioner Shinn [now Campbell] were fully aware of the requirements of Title VI and of their obligations, as recipients of federal assistance, to comply with their assurances to the EPA that they will meet such requirements. They knew that their use of the NAAQS and related environmental standards as the sole criteria was not consistent with the EPA's Guidances for recipients of financial assistance and was in violation of Title. VI.

f. The DEP and Commissioner Shinn [now Campbell] knew of the region's non-compliance with the EPA's proposed standard for PM–2.5 and that the scientific evidence on which the EPA proposed standard was based. The DEP and Commissioner Shinn [now Campbell] also knew that SLC would emit significant levels of PM–2.5.

g. The DEP and Commissioner Shinn [now Campbell] failed to consider the health effects of SLC's PM–2.5 emissions in making its [sic] determination that there would be no adverse effects from SLC operations, and to inform the public about such health effects.

h. The DEP and Commissioner Shinn [now Campbell] knew of the region's non-compliance with the NAAQS for ozone and that the emissions from diesel trucks and SLC's other emissions would tend to increase the level of non-compliance and cause adverse health effects on the residents.

i. The DEP and Commissioner Shinn [now Campbell] issued the permits to SLC even though they knew of the illegal discriminatory impact it would have upon plaintiffs and other African–American and Hispanic residents.

j. The DEP and Commissioner Shinn [now Campbell] have engaged in a statewide pattern and practice of granting permits to polluting facilities to operate in communities where most of the residents are African–American and/or Hispanic to a greater extent than in predominately white communities, resulting in discriminatory impact on the grounds of race, color, and national origin.

k. The DEP and Commissioner Shinn [now Campbell] have failed to develop or implement a procedure that ensures there will be no discrimination in their permitting decisions or to provide for meaningful public participation for residents of communities affected by the permitting decisions.

l. The DEP and Commissioner Shinn [now Campbell] failed to translate documents which were made available in English into Spanish, even though they knew or should have known that a significant number of the affected people are Hispanic and have limited English proficiency, so that they require Spanish language materials to be available for meaningful participation in the permit process.

m. The DEP and Commissioner Shinn's [now Campbell] prior history of permitting decisions and their issuance of the permit to SLC despite knowledge of its discriminatory effects demonstrate that defendants intended to and did discriminate against plaintiffs on the basis of race, color, and national origin.

Second Amended Compl. ¶ 101(a)-(m).

Protection Clause of the Fourteenth Amendment and § 1983. Compl. ¶¶ 109–13. Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

The Supreme Court has made it clear that "the reach of Title VI's protection extends no further than the Fourteenth Amendment." *United States v. Fordice,* 505 U.S. 717, 732 n. 7, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) (citing *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 287, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). In order to state a claim upon which relief can be granted under either § 601 of Title VI or the Equal Protection Clause of the Fourteenth Amendment and § 1983, a party must allege that he or she was the target of purposeful, invidious discrimination. *See Alexander v. Sandoval,* 532 U.S. 275, 285, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (rejecting any application of § 601 of Title VI that extends beyond intentional discrimination); *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("[A]s we made clear in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 [(1976)] and *Arlington Heights v. Metropolitan Hous. Dev. Corp.* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose."). *See also Alexander v. Choate,* 469 U.S. 287, 292–93, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 564 (3d Cir.2002). In order to conclude that the SCCIA Plaintiffs have failed to state a claim of intentional discrimination, I must find "beyond a doubt" that no set of facts alleged in the Second Amended Complaint would entitle them to relief. *Pryor,* 288 F.3d at 564.

A plaintiff who seeks recovery under a theory of purposeful discrimination must demonstrate that governmental authority implemented the facially neutral policy at issue " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 562 (quoting *Feeney,* 442 U.S. at 279, 99 S.Ct. 2282). *See also Stehney v. Perry,* 101 F.3d 925, 937–38 (3d Cir.1996) (upholding lower court's dismissal pursuant to Rule 12(b)(6) because plaintiff had merely alleged that a facially neutral policy had a discriminatory effect).

> Determining whether invidious discrimination was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether "it bears more heavily on one race than another," *Washington v. Davis, supra,* 426 U.S. at 242, 96 S.Ct. at 2049 may provide an important starting point. Sometimes a clear pattern, unexplainable on other grounds than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.

*Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555. The Supreme Court, however, has recognized that "disproportionate impact is not the sole touchstone of invidious racial discrimination," *id.* at 265, 97 S.Ct. 555, but rather, "is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Pryor,* 288 F.3d

at 563 (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997)).

In addition to disproportionate impact, the other factors indicative of a discriminatory animus include: (1) the "historical background of the decision," *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555 (observing that the historical background of a state action is an "evidentiary source, particularly if it reveals a series of official action taken for invidious purposes"); (2) any "departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role," *id.*; (3) any "[s]ubstantive departures ... particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," *id.*; and (4) the foreseeability of the consequences of the state action, *see Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) ("[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose."). *See also Baker v. City of Kissimmee*, 645 F.Supp. 571, 585 (M.D.Fl.1986) ("These factors, probative of discriminatory intent include: (1) the nature and magnitude of the disparity itself ...; (2) foreseeability of the consequences of the [state] actions; (3) legislative and administrative history of the decision-making process; and (4) knowledge, in that a defendant's actions would be known to have caused [a] discriminatory impact ....") (citing *Ammons v. Dade City*, 783 F.2d 982, 987–88 (11th Cir.1986), and *Dowdell v. City of Apopka*, 698 F.2d 1181, 1186 (11th Cir.1983)).

Once a plaintiff has established that the state actor harbored a discriminatory intent, the burden shifts to the state actor to show that the same decision would have resulted in the absence of a discriminatory animus. *See id.* at 271 n. 21, 97 S.Ct. 555.

> Proof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind could no longer attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision.

*Id.*

In their motion to dismiss, the NJDEP Defendants contend that the SCCIA Plaintiffs have failed to state a claim of intentional discrimination upon which relief can be granted under the applicable statutory and constitutional provisions. Specifically, the NJDEP Defendants argue that the SCCIA Plaintiffs' allegations are legally deficient because they have merely alleged that Defendants knew or were deliberately indifferent to the disparate impact the siting of the cement grinding facility would have on the residents of Waterfront South. *See* Defs. NJDEP and Bradley M. Campbell's Br. in Support of Motion to Dismiss under Fed.R.Civ.P. 12(b)(6) at 11 ("NJDEP Br."). According to the NJDEP Defendants, "these allegations [do not] meet the legal test for a private cause of action under Title VI because they do not contend that the New Jersey Defendants issued the permits for St. Lawrence *because* the area's residents are Black or Hispanic." *Id.* at 12 (emphasis in original). The NJDEP Defendants further

argue that "an intentionally discriminatory motive [cannot] be reasonably inferred from the complaint because it is incontrovertible that the air pollution criteria that were applied in South Camden to St. Lawrence are uniformly applicable throughout New Jersey and even nationally." *Id.* at 12–13.[5]

In response, the SCCIA Plaintiffs contend that not only are allegations of disparate impact "highly relevant and probative of discriminatory motive," but also that they have alleged "numerous other circumstances which support a finding of intent, including DEP's historical practices and the specific sequence of events leading to the issuance of the permit," as well as NJDEP's "knowledge of the discriminatory impact of its actions...." Pls.' Br. in Opposition to Defs.' Motion to Dismiss at 4–5 ("SCCIA Br."). Moreover, the SCCIA Plaintiffs contend that the NJDEP's justification for issuing the permits, namely that it acted within the parameters of federal environmental laws and did not violate the National Ambient Air Quality Standards ("NAAQS"), goes to the merits of the case, and has no bearing upon whether the SCCIA Plaintiffs have stated a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6).

I agree with the SCCIA Plaintiffs that the Second Amended Complaint contains allegations sufficient to state a cause of action of intentional discrimination under both § 601 of Title VI and the Fourteenth Amendment. In support of their claim that the NJDEP Defendants purposefully and invidiously discriminated against them on the basis of their race, color, and national origin, the SCCIA Plaintiffs allege facts which, if proven true, would show not only that the operation of the cement grinding facility would have a disparate impact upon the predominantly minority community of Waterfront South, but also that the NJDEP was well-aware of the potential disproportionate and discriminatory burden placed upon that community and failed to take measures to assuage that burden. *See supra* Note 2 of this Opinion. As I have already noted, the controlling decisions of the Supreme Court and the Third Circuit make it clear that a case of intentional discrimination is often based upon the type of circumstantial evidence which the SCCIA Plaintiffs allege in the Second Amended Complaint, namely, disparate impact, history of the state action, and foreseeability and knowledge of the discriminatory onus placed upon the complainants. *See, e.g., Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555; *Penick,* 443 U.S. at 465, 99 S.Ct. 2941; *Pryor,* 288 F.3d at 563. The NJDEP Defendants disregard the fact that, in addition to alleging disparate impact and knowledge, the SCCIA Plaintiffs also maintain that the NJDEP has historically "engaged in a statewide pattern and prac-

5. More specifically, the NJDEP Defendants contend that SLC's facility, a stationary source, met certain standards of performance for air control pollution which were established under the Clean Air Act, 42 U.S.C. § 7409(1) ("CAA"). The NJDEP Defendants also argue that the operation of SLC's facility would not "cause or significantly contribute to a violation of the National Ambient Air Quality Standards and that the health risks of hazardous and carcinogenic substances would be at negligible levels." NJDEP Br. at 14. In response to the SCCIA Plaintiffs' claim that the NJDEP failed to comply with a NAAQS standard set for PM–2.5 (particulate matter) emissions, Defendants maintain that the United States Court of Appeals for the District of Columbia Circuit found such a standard unenforceable, *see American Trucking Assocs., Inc. v. United States Environmental Protection Agency,* 175 F.3d 1027 (D.C.Cir. 1999), *rev'd in part, Whitman v. American Trucking Assocs.,* 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), and, as such, "the delay in implementation of the PM–2.5 NAASQ" has prevented the determination of the actual ambient air concentrations of PM 2.5 in this region. NJDEP Br. at 16.

tice of granting permits to polluting facilities to operate in communities where most of the residents are African–American and/or Hispanic to a greater extent than in predominately white communities." Second Amended Compl. ¶ 101(j).

Moreover, the Third Circuit has shown a reluctance to dismiss claims of intentional discrimination on Rule 12(b)(6) motions. Indeed, in a recent decision, *Pryor v. Nat'l Collegiate Athletic Assoc.*, the Third Circuit held that "issues of the mind (*e.g.*, intent) are often unsuitable for a Rule 12(b)(6) motion to dismiss." 288 F.3d at 565. In *Pryor*, plaintiffs, African–American student athletes recruited by separate universities, challenged a facially neutral rule adopted by the National Collegiate Athletic Association ("NCAA"), which instituted scholarship and athletic eligibility criteria for incoming student athletes in an effort to increase graduation rates for those minority student athletes. *Id.* at 552. Plaintiffs alleged that the NCAA adopted the otherwise facially neutral policy in an attempt to reduce the number of African–American students who would qualify for athletic scholarships. *Id.* The Court held that the plaintiffs had stated a cause of action of intentional discrimination under § 601 of Title VI:

> [T]he complaint alleges that the NCAA purposefully discriminated against black student athletes (like Plaintiffs) when it adopted Proposition 16 because the NCAA knew—via various studies and reports—that the heightened academic standard would effectively "screen out" or reduce the percentage of black athletes who could qualify for athletic scholarships. In short, the complaint alleges that the NCAA adopted Proposition 16 because it knew that the policy would prevent more black athletes from ever receiving athletic scholarships in the first place.

*Id.* at 564.

The *Pryor* Court went on to distinguish a case upon which the NJDEP Defendants rely here, *Personnel Adm'r of Mass. v, Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). In *Feeney,* a female plaintiff brought a suit in which she alleged that the Massachusetts veterans' preference statute discriminated against women in violation of the Equal Protection Clause. *Id.* at 259, 99 S.Ct. 2282. Under the Massachusetts statute, veterans, a predominately male group, are considered ahead of non-veterans for civil service positions. *Id.* The Supreme Court held that the record established before the district court did not support a finding of intentional discrimination. Rather, the Court found that although the state was aware of the discriminatory impact of the Massachusetts statute, the record failed to establish that "this preference for veterans was originally devised or subsequently reenacted because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place in the Massachusetts Civil Service." *Id.* at 279, 99 S.Ct. 2282.

The *Pryor* Court was quick to recognize that in *Feeney,* the Supreme Court "upheld a policy that favored veterans only after the compilation of a record showed" the nonexistence of a discriminatory purpose. *Pryor,* 288 F.3d at 564. Conversely, in *Pryor,* the Third Circuit held that "based [solely] on the face of the complaint and all reasonable inferences thereto, the NCAA at least partially intended to reduce the number of black athletes who could attend college on an athletic scholarship by adopting the heightened academic requirements of Proposition 16." *Id.* Likewise, at the early stage of this recently remanded case where a record has not yet been

developed, the allegations contained in the Second Amended Complaint suggest that the NJDEP Defendants may have intended invidious discrimination against African-American and Hispanic residents of Waterfront South by granting various permits to SLC, and thereby concentrating a disproportionate amount of air pollution in an already environmentally challenged community.[6]

Furthermore, it is inappropriate at this stage of these proceedings to argue the merits of the case, as the NJDEP Defendants have done in their moving papers. Indeed, "a complaint requires only a 'short and plain statement' to show a right to relief, not a detailed recitation of the proof that will in the end establish such a right." *Id.* at 564 (*quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). If the NJDEP Defendants acted within the parameters of the law in issuing air permits to SLC, *see* NJDEP Br. at 13–16, they will have the opportunity to present supporting evidence to this Court in a motion for summary judgment, or ultimately at trial.

In sum, I conclude that the SCCIA Plaintiffs have stated a claim of intentional discrimination upon which relief can be granted under either § 601 of Title VI or the Equal Protection Clause of the Fourteenth Amendment and § 1983 because I cannot say "beyond doubt" that there is no set of facts alleged in the Second Amended Complaint, which if proven, would entitle them to relief. *Pryor,* 288 F.3d at 564. Accordingly, I shall deny the NJDEP Defendants' motion to dismiss the First and Third Counts of the Second Amended Complaint, to the extent that they allege that the NJDEP Defendants intentionally discriminated against the SCCIA Plaintiffs in violation of both § 601 of Title VI and the Equal Protection Clause of the Fourteenth Amendment and § 1983.

### B. UNLAWFUL DISCRIMINATION UNDER THE FAIR HOUSING ACT

The SCCIA Plaintiffs' allegation that the NJDEP Defendants violated the Fair Housing Act presents a more difficult issue. Specifically, the SCCIA Plaintiffs contend that: "By granting the permits to SLC, DEP has caused a diminution in both the quantity and quality of the available housing stock in the Waterfront South neighborhood, which has a discriminatory impact on the Waterfront South residents on the basis of race, color, and national origin in violation of Title VIII [of the Civil Rights Act of 1968, 42 U.S.C. § 3604(a) ]." Second Amended Compl. ¶ 117. Whether the SCCIA Plaintiffs have stated a claim upon which relief can be granted under the Fair Housing Act is contingent upon one issue: Does the NJDEP provide a service to the residents of Waterfront South in a manner contemplated by the Fair Housing Act? While the question is not free from doubt, I ultimately conclude that the NJDEP does not provide such a service.

The Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.*, prohibits "both direct discrimination and practices with significant discriminatory effects" on the availability of housing. *See Southend Neighborhood Improvement Ass'n v. County of St. Clair,* 743 F.2d 1207, 1209 (7th Cir.1984). The

6. The NJDEP's reliance on *The South Bronx Coalition for Clean Air, Inc. v. Conroy,* 20 F.Supp.2d 565 (S.D.N.Y.1998), is equally misplaced. In *Conroy,* the court was considering whether to enjoin state defendants from expanding a solid waste transfer site, which plaintiffs alleged was an effort to discriminate against the minority residents of a South Bronx neighborhood in violation of Title VI. *Id.* at 571–72. In holding that plaintiff had failed to prove purposeful discrimination, the court ruled based upon a well-developed record. *Id.*

relevant provisions of Title VIII make it unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a)-(b). According to floor debates in the Senate, which ultimately enacted the legislation that became the Fair Housing Act, the underlying policy behind Title VIII is to encourage the dispersion of urban ghettos and to create more integrated neighborhoods. *See* 114 Cong. Rec. 2985 (1968) (statement of Sen. Proxmire) (noting that Title VIII will establish "a policy of dispersal through open housing ... look[ing] to the eventual dissolution of the ghetto and the construction of low to moderate income housing in the suburbs."). *See also* Stanley P. Stocker–Edwards, *Black Housing 1860–1980: The Development, Perpetuation, and Attempts to Eradicate the Dual Housing Market in America*, 5 *Harv. BlackLetter L.J.* 50 (1988). Senator Walter Mondale stated that Title VIII represents "an absolutely essential first step" toward reversing the pattern of "two separate Americas constantly at war with one another." 114 Cong. Rec. 2274 (1968). *See also id.* at 2524 (Statement of Sen. Brooks) ("Discrimination in the sale and rental of housing has been the root cause of the widespread patterns of de facto segregation which characterize America's residential neighborhoods."). In accordance with the legislative intent that can be gleaned from congressional records, the Supreme Court has held that Title VIII should be afforded a "generous construction." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

### 1. Have the SCCIA Plaintiffs Stated a Claim under § 3604(a) of the Fair Housing Act?

That being said, however, it is not true that the tentacles of Title VIII extend beyond the availability of housing or related services. The NJDEP Defendants contend that they have taken no action to deny the residents of Waterfront South the sale or rental of residential property or to evict them from their homes. In response, the SCCIA Plaintiffs maintain in their moving papers that their situation is analogous to a "constructive eviction." SCCIA Br. at 22. According to the SCCIA Plaintiffs, the permitting of the cement grinding facility by the NJDEP is an act which rendered the Waterfront South neighborhood uninhabitable.

The SCCIA Plaintiffs' arguments, although creative, are unavailing. First, the SCCIA Plaintiffs have not alleged facts in their Second Amended Complaint that, if true, would state a claim of "constructive eviction." The SCCIA Plaintiffs have failed to allege the most obvious element of "constructive eviction"—that residents vacated the Waterfront South community. *See Reste Realty Corp. v. Cooper,* 53 N.J. 444, 461, 251 A.2d 268, 277 (1969) ("The general rule is, of course, that a tenant's right to claim a constructive eviction will be lost if he does not vacate the premises within a reasonable time after the right comes into existence.").

I conclude that in granting SLC permits to operate a cement grinding facility, the NJDEP's actions at most had an indirect effect on the availability of housing in the Waterfront South community. A survey of the case law in this area reveals that, in

order to have a cognizable claim under § 3604(a), plaintiffs must establish a far closer nexus between housing availability and the challenged action. *See, e.g., Keith v. Volpe,* 858 F.2d 467 (9th Cir.1988), *cert. denied,* 493 U.S. 813, 110 S.Ct. 61, 107 L.Ed.2d 28 (1989) (finding a violation of Title VIII under circumstances where the city's refusal to approve construction of low income housing deprived minorities of available housing); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926 (2d Cir.), *aff'd in part,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (determining that defendants violated Title VIII by refusing to amend a zoning ordinance to permit the construction of a multi-family dwelling); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 148 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978) (holding that the delay in the construction of a low-income housing development project had a discriminatory effect on the availability of housing to minorities); *United States v. City of Black Jack,* 508 F.2d 1179, (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) (recognizing that a local government may be liable under Title VIII for a zoning ordinance which prohibited the construction of multi-family dwellings).

On the other hand, when courts have been faced with circumstances where there is only a remote connection between housing availability and the disputed action, they have been reluctant to extend the reach of Title VIII. *See, e.g., Clifton Terrace Assocs., Ltd. v. United Techs. Corp.,* 929 F.2d 714, 719 (D.C.Cir.1991) (holding that an elevator manufacturer does not have a duty to furnish housing services in a nondiscriminatory manner, and observing that § 3603(a) is "clearly confined to discrimination by providers of housing"); *Southend Neighborhood Improvement Ass'n v. County of St. Clair,* 743 F.2d 1207, 1210 (7th Cir.1984) (holding that a county's failure to repair or remove dilapidated buildings it purchased by tax deed, which allegedly damaged property owners' interests in neighboring properties, failed to state claim under § 3604(a)); *Laramore v. Illinois Sports Facilities Auth.,* 722 F.Supp. 443, 452 (N.D.Ill.1989) (holding that plaintiffs who alleged that the siting of a sports stadium had a discriminatory effect on displaced residents did not state a cognizable claim under § 3604(a)). Indeed, the United States Court of Appeals for the Fourth Circuit recognized that § 3604(a) does not extend to every government action "that might conceivably affect the availability of housing." *Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419, 423 (4th Cir.1984).

In a more recent decision—one with facts substantially analogous to this case—the Fourth Circuit held that the application of Title VIII, specifically § 3604(a), did not extend to the siting of a state highway which, according to plaintiffs, had a discriminatory effect on an adjacent neighborhood with a significant minority population. *Jersey Heights Neighborhood Assoc. v. Glendening,* 174 F.3d 180, 192 (4th Cir.1999).

> The Neighborhood Association does not allege that anyone has for discriminatory reasons been evicted from his home or denied the right to purchase or rent housing. Instead, the Association claims that appellees violated these statutory provisions simply by selecting the current corridor for the Route 50 Bypass. Because this challenge to the highway site is too remotely related to the housing interests that are protected by the Fair Housing Act, we affirm the district court's dismissal of this count for failure to state a claim under the statute.
>
> With regard to section 3604(a), the agencies did not "make unavailable or deny a dwelling to any person" within the

> meaning of the Fair Housing Act. Although the Neighborhood Association claims that this provision reaches every practice having the effect of making housing more difficult to obtain, the text of the statute does not extend so far.

*Id.*

Similarly, in this case, assuming the truth of the allegations the SCCIA Plaintiffs assert in the Second Amended Complaint for the purposes of this motion only, the NJDEP's decision to grant air pollution permits to SLC which authorized the construction of the cement grinding facility had, at most, a remote impact on the availability of housing in the Waterfront South community. The NJDEP has not evicted citizens of that community from their residences or denied them the right to rent or purchase housing. If I were to extend the scope of § 3604(a) beyond its plain language—to reach any official decision which has an indirect effect on the availability of housing—the effect would be, as the Fourth Circuit observed in *Jersey Heights,* to "warp the statute into a charter of plenary review." 174 F.3d at 192. Even a broad reading of § 3604(a) does not support such a result. I conclude, therefore, that the SCCIA Plaintiffs have failed to state a claim which relief can be granted under § 3604(a) of Title VIII.

### 2. Have the SCCIA Plaintiffs Stated a Claim under § 3604(b) of the Fair Housing Act?

■ More interestingly, the SCCIA Plaintiffs claim that the NJDEP was providing a service to the residents of Waterfront South, which in turn would bring the NJDEP under the umbrella of § 3604(b) of Title VIII. Specifically, they maintain that because the NJDEP "is responsible for the promotion of environmental protection and the prevention of pollution of the environment of the State ... [and] oversees sanitary engineering and sewerage systems in New Jersey," it "qualifies as a 'governmental unit' which provides services [directly related to housing] much like garbage collection." SCCIA Br. at 19–20. The SCCIA Plaintiffs analogize the circumstances in this case to those presented in *Campbell v. City of Berwyn,* 815 F.Supp. 1138, 1144 (N.D.Ill.1993), where the district court held that citizens who alleged that the city's termination of police protection interfered with their right to fair housing sufficiently stated a claim under § 3604(b). The *Campbell* court further observed that § 3604(b) "applies to services generally provided by governmental units such as police and fire protection or garbage collection." *Id.* at 1143–44 (quoting *Southend Neighborhood Improvement Ass'n,* 743 F.2d at 1210).

The NJDEP Defendants contend, on the other hand, that the NJDEP does not provide the type of services contemplated by § 3604(b), and, therefore, the SCCIA Plaintiffs have failed to state a cognizable claim under that provision of Title VIII. The NJDEP Defendants maintain that significant parallels exist between the SCCIA Plaintiffs' claim and the claims presented in both *Jersey Heights,* 174 F.3d at 193, and *Laramore,* 722 F.Supp. at 452–53. The NJDEP Defendants point out that both courts, in considering whether Title VIII was applicable to either the siting of a state highway or a sports stadium, held that Title VIII does not extend to every service which may have an effect on residents of a neighborhood. *Jersey Heights,* 174 F.3d at 192–93; *Laramore,* 722 F.Supp. at 452. Similar to their argument that the SCCIA Plaintiffs failed to state a claim under § 3604(a), the NJDEP Defendants contend that the granting of industrial air pollution permits is simply too far removed to fall within the scope of the remedial objectives of § 3604(b).

I conclude that the NJDEP Defendants have the better argument. If I were to

accept the SCCIA Plaintiffs' argument that § 3604(b) extends to the decision of every governmental agency that may have an indirect impact on housing, Title VIII would be "a civil rights statute of general applicability rather than one dealing with the specific problems of fair housing." *Jersey Heights,* 174 F.3d at 193. Although the NJDEP clearly provides a number of valuable services to the citizens of the State of New Jersey by enacting regulations and overseeing their implementation, it does not follow that it provides specific residential services. The NJDEP is not responsible for door-to-door ministrations such as those provided by police departments, fire departments, or other municipal units.[7] The SCCIA Plaintiffs, therefore, have failed to state a cognizable claim under § 3604(b).

Because their claim does not come within the purview of Title VIII, I need not address the SCCIA Plaintiffs' subsequent claim that they have stated a prima facie claim under Title VIII based upon a "perpetuation of segregation" theory. Accordingly, I shall grant the NJDEP Defendants' motion to dismiss the Fourth Count of the Second Amended Complaint, which alleges that the NJDEP Defendants violated § 3604(a)-(b) of Title VIII, also known as the Fair Housing Act.

## C. NUISANCE

Finally, the SCCIA Plaintiffs allege that SLC, "through the operation of its [cement grinding] facility, and through the associated use of diesel trucks," has created both a public and private nuisance in the Waterfront South neighborhood. Second Amended Compl. ¶¶ 120–34. SLC moves to dismiss the nuisance claims on the basis that, because the SCCIA Plaintiffs have failed to allege that the construction of the cement grinding facility was in violation of regulations promulgated under the Clean Air Act, 42 U.S.C. § 7409(1) ("CAA"), and permits issued by the NJDEP, they have failed to state a valid claim of either private or public nuisance.

### 1. Have the SCCIA Plaintiffs Stated a Claim of Private Nuisance?

According to the Supreme Court of New Jersey, "the essence of a private nuisance is an unreasonable interference with the use and enjoyment of land." *Sans v. Ramsey Golf & Country Club, Inc.,* 29 N.J. 438, 448, 149 A.2d 599, 605 (1959).

> Litigation of this type usually deals with the conflicting interests of property owners and the question of the reasonableness of the defendant's mode of use of his land. The process of adjudication requires recognition of the reciprocal rights of each owner to reasonable use, and a balancing of the conflicting interests. The utility of the defendant's conduct must be weighed against the quantum of harm to the plaintiffs. The question is not simply whether a person is annoyed or disturbed, but whether the annoyance or disturbance arises from an unreasonable use of the neighbor's land or operation of his business.

*Id.* The Restatement (Second) of Torts § 821D defines a private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land."

7. Moreover, the SCCIA Plaintiffs' attempt to distinguish the circumstances in *Jersey Heights* is unpersuasive. While the Fourth Circuit certainly agreed with the SCCIA Plaintiffs' assertion that "building a highway does not fall within the services provided by governmental units such as police and fire protection or garbage collection," that argument equally applies to the services provided by the NJDEP. *See* SCCIA Br. at 29 (internal quotation omitted).

In order to state a claim of private (or even public) nuisance, a litigant must allege either an act or a failure to act "under circumstances in which the actor is under a duty to take positive action to prevent or abate the ... invasion of the private interest." *See* Restatement (Second) of Torts § 824; *Birchwood Lakes Colony Club Inc. v. Borough of Medford Lakes,* 90 N.J. 582, 592, 449 A.2d 472, 477 (1982). A defendant is only liable for a nuisance that "causes significant harm, of a kind that would be suffered by a normal person in the community." Restatement (Second) of Torts § 821F.

> By significant harm is meant harm of importance, involving more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable invasion of the plaintiff's interests before he can have an action for either a public or a private nuisance. In the case of a ... private nuisance, there must be a real and appreciable interference with the plaintiff's use or enjoyment of his land before he can have a cause of action.

*Id.* at cmt. b. *See also Hrycenko v. Bd. of Adjustment of the City of Elizabeth,* 27 N.J.Super. 376, 381, 99 A.2d 430, 433 (App. Div.1953) ("To constitute an actionable nuisance, the operation complained of must be such as to affect injurirously [sic] and to an unreasonable extent the health or comfort of ordinary people living within the vicinity.").

■ SLC's challenge to the SCCIA Plaintiffs' claim of private nuisance is twofold. First, SLC maintains that the SCCIA Plaintiffs cannot argue that the operation of the cement grinding facility creates a private nuisance when they have failed to allege that "SLC has violated the Air Permit or has failed to comply with all of its conditions and requirements." SLC Br. at 34. Second, SLC contends that the SCCIA Plaintiffs "could not, as a matter of law, demonstrate that the Facility's operations caused them any significant harm." *Id.* Because the cement grinding is located in an area zoned industrial, residents in such an area "must expect a certain degree of noise, odors, and the like. Thus, in context, SLC's operation of the Facility simply cannot be considered annoying or offensive, and Plaintiffs cannot as a matter of law demonstrate that those operations cause significant harm." *Id.* at 35–36.

A review of New Jersey case law, however, does not support SLC's first argument. A private nuisance may exist in New Jersey even when there is compliance with controlling governmental regulations. *See Rose v. Chaikin,* 187 N.J.Super. 210, 217, 453 A.2d 1378, 1381 (Ch.Div.1982) ("Whether a given use complies with controlling governmental regulations, while not dispositive on the issue of private nuisance, *Monzolino v. Grossman,* 111 N.J.L. 325, 328, 168 A. 673 (N.J.Err. & App.1933), does not impact on its reasonableness.").

> [A]lthough the noises may emanate from the conduct of a business duly licensed by the State ..., the character, volume, frequency, duration, time, and locality of the noises continue to be relevant factors in determining whether the alleged annoyance surpasses the requirements that the business operations and in fact unreasonably interferes with the ordinary comfort of human existence in the neighborhood....
>
> Indeed, *the legislature or governmental agencies cannot constitutionally confer upon individuals or private corporations acting primarily for the own profit ... any right to deprive persons of the lawful enjoyment of their property.*

*Hyde v. Somerset Air Serv.,* 1 N.J.Super. 346, 349–50, 61 A.2d 645, 646–47 (Ch.Div. 1948) (emphasis added) (granting an injunction to complainants who alleged that

the resulting noises of a duly licensed flight school, which conducted low altitude flight operations over their properties, constituted a private nuisance because of significant interference with the peaceful use and occupation of complainants' residences). *See also Kozesnik v. Township of Montgomery,* 24 N.J. 154, 176, 131 A.2d 1, 13 (1957) ("It is true that where a nuisance results, it is no defense that the zoning ordinance authorized the operation and hence judicial relief may be had."). For that reason, SLC's reliance on the Restatement (Second) of Torts § 821B cmt. f, which pertains only to claims of *public nuisance,* is misplaced. *See* SLC Br. at 34; Restatement (Second) of Torts § 821B cmt. f ("[C]onduct that is fully authorized by statute, ordinance or administrative regulations does not subject the actor to tort liability.").[8]

As to their second argument that as a matter of law, the SCCIA Plaintiffs have failed to demonstrate that the operation of the cement grinding facility caused them substantial harm, SLC improperly asks this Court to consider the merits of the SCCIA Plaintiffs' claims in deciding SLC's Rule 12(b)(6) motion. As previously noted, it is axiomatic that a court may not consider the merits of a plaintiff's claims on a Rule 12(b)(6) motion, but rather, must accept as true the allegations in the complaint. To state a claim, a complaint does not require, as SLC seems to suggest, a detailed recitation of the proofs that will establish liability. *See supra* Part III of this Opinion.

In the Second Amended Complaint, the SCCIA Plaintiffs allege sufficient facts that, if true, could lead a factfinder to conclude that the operation of the cement grinding facility causes substantial harm to the residents of the Waterfront South community. More specifically, the SCCIA Plaintiffs maintain that emissions from the cement grinding facility have increased the level of pollution in the air to the point that their health and safety, as well as that of their children and families, is significantly endangered. In addition, the SCCIA Plaintiffs allege that the annual ingress and egress of nearly 80,000 delivery trucks, in addition to threatening the health of those residing in the Waterfront South neighborhood, will also create noise, vibrations, and dust which will "affect the quality of life, interfere with sleep, cause property damage, and lower the self-esteem of plaintiffs. . . ." *Id.* ¶¶ 51–57. New Jersey courts have recognized the existence of a private nuisance when similar factors have been present. *See Sans,* 29 N.J. at 448–50, 149 A.2d at 605–06 (affirming the trial court's finding that the pedestrian traffic resulting from the placement of a golf course tee near complainant's property constituted a private nuisance); *Rose,* 187 N.J.Super. at 216–20, 453 A.2d at 1381–83 (holding that because of its character, duration, and volume, the noise created by the twenty-four hour a day operations of a windmill constituted an actionable private nuisance); *Hyde,* 1 N.J.Super. at 351–53, 61 A.2d at 647–48 (finding that noise and vibrations resulting from low flying airplanes created a private nuisance).

For these reasons, I conclude that the SCCIA Plaintiffs have stated a claim of private nuisance upon which relief can be granted. Accordingly, I shall deny SLC's motion to dismiss the Fifth Count of the

8. Likewise, SLC's reliance on *Mayor & Council of Borough of Alpine v. Brewster,* 7 N.J. 42, 80 A.2d 297 (1951), is misplaced. SLC cites this case for the proposition that an action that has been determined to be legal by the legislature or governmental agency cannot be a nuisance. *Brewster,* however, addressed only a claim of *public nuisance. Id.* at 49–54, 80 A.2d at 300–02.

Second Amended Complaint which alleges a claim of private nuisance.

2. **Have the SCCIA Plaintiffs Stated a Claim of Public Nuisance?**

Unlike a private nuisance which contemplates the invasion of an individual's interest "in the private use and enjoyment of land, a public nuisance is 'an unreasonable interference with a right common to the general public.'" *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 315 (3d Cir.1985) (quoting Restatement (Second) of Torts § 821B(1)).

> Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>
> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>
> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B(2).

In support of its motion to dismiss the claim of public nuisance, SLC advances the same argument that it made to challenge the SCCIA Plaintiffs' private nuisance claim, namely, that because it obtained permits from the NJDEP and did not violate any controlling regulations, it can not as a matter of law, be held liable for the creation of a public nuisance. SLC Br. at 36–37. Alternatively, SLC maintains that the SCCIA Plaintiffs have failed to allege that they suffered harm of a different kind than that suffered by other members of the public. *Id.* at 37–38.

In making its first argument, SLC relies on Comment f of the Restatement (Second) of Torts § 821B, which provides:

> Although it would be a nuisance at common law, *conduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability.* Aside from the question of the validity of the legislative enactment, there is the question of its interpretation. Legislation prohibiting some but not other conduct is not ordinarily construed as authorizing the latter. In the case of negligence as a matter of law, the standard defined by a legislative enactment is normally a minimum standard, applicable to the ordinary situations contemplated by the legislation. Thus traveling at less than the speed limit may still be negligence if traffic conditions indicate that a lesser speed is required. (See § 288C). The same general principle applies to public nuisance. Consideration may appropriately be given, however, to the fact that acts were taken in reliance upon legislation, as when expensive screening processes are installed to reduce the level of pollution to a legislative maximum.
>
> In addition, if there has been established a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct, the courts are slow to declare an activity to be a public nuisance if it complies with the regulations. Thus, at one time courts frequently engaged in "judicial zoning," or the determination of whether a particular land use was unsuitable to a locality and therefore unreasonable. Now that most cities have complete sets of zoning regulations and agencies to plan and administer them, the courts have shown an inclination to leave the problem of the appropriate location of certain types of activities, as distinguished from the way in which they are

> carried on, to the administrative agencies. The variety and complexity of a problem and of the interests involved and the feeling that the particular decision should be a part of an overall plan prepared with a knowledge of matters not presented to the court and of interests not represented before it, may also promote judicial restraint and a readiness to leave the question to an administrative agency if there is one capable of handling it appropriately.

*Id.* (emphasis added). In response, the SCCIA Plaintiffs contend that compliance with governing regulations is only one of the factors which a court should consider in determining whether a party has established a claim of public nuisance, and that, aside from citing the Restatement (Second) of Torts and case law from other jurisdictions, SLC has provided no support for its argument.

Ironically, the SCCIA Plaintiffs cite no case law in support of their assertions, perhaps because the few New Jersey cases that have addressed the issue have concluded that a party whose actions are authorized by a governing body cannot be held liable for a public nuisance. *See Cherry Hill Township v. New Jersey Racing Comm'n,* 131 N.J.Super. 125, 146, 328 A.2d 653, 664 (Law Div.1974) ("Where, as here, the Legislature has authorized the State Department of Health to approve the discharge of effluent from a sewage disposal plant into a stream in this State, even though the discharge of said effluent would, under common law, be deemed a public nuisance, it does not constitute such a public nuisance."); *Mayor & Council of Borough of Alpine v. Brewster,* 7 N.J. 42, 50, 80 A.2d 297, 300 (1951) ("It is settled that within constitutional limits not exactly determined the legislature may change the common law as to nuisances, and may move the line either way, so as to make things nuisances which were not so, or to make things lawful which were nuisances, although by so doing it affects the use or value of property.") (quoting *Commonwealth v. Parks,* 155 Mass. 531, 30 N.E. 174 (1892) (Holmes, J.)).

Very recently, however, the Appellate Division of the Superior Court of New Jersey held that handgun manufacturers may be liable for creating a public nuisance even if their conduct falls within the framework of the governing laws. *See James v. Arms Tech., Inc.,* 359 N.J.Super. 291, 820 A.2d 27, 49–52 (2003). Considering the impact of the Restatement (Second) of Torts § 821B, cmt. f, the court noted that the activities in which the defendants engaged were not fully regulated.

> [W]hile it is true that some aspects of gun sales are regulated, the reality is that their [the gun industry's] marketing and distribution policies and practices exist in a regulatory vacuum, in that there is generally no regulation of the quantity, frequency, or purpose of firearm purchases or sales nor is there any national registration of purchasers or firearms. Thus the specific conduct alleged to constitute the public nuisance—fostering an illegal secondary gun market—is not closely regulated.

*Id.* at 52 (internal citations and quotations omitted).

There is a distinction to be drawn between *James* and this case. Not only can the argument be made that the emission of pollutants is fully regulated under both federal and state laws and the implementing regulations promulgated thereunder, *see* 42 U.S.C. §§ 7401 *et seq.* (Clean Air Act); N.J.S.A. §§ 26:2C–1 *et seq.,* but also, in this case, the activities in which SLC engaged were affirmatively sanctioned by the NJDEP by way of air permits. Because the SCCIA Plaintiffs have not alleged that SLC's activities were not fully regulated, I conclude that the SCCIA Plaintiffs cannot state a claim of public

nuisance. Accordingly, I shall grant SLC's motion to dismiss the Sixth Count of the Second Amended Complaint which alleges a claim of public nuisance.

## V. CONCLUSION

For the reasons set forth above, I shall grant in part and deny in part the motions of the NJDEP Defendants and SLC to dismiss the SCCIA Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). Specifically, I shall: (1) deny the NJDEP Defendants' motion to dismiss the First and Third Counts of the Second Amended Complaint, to the extent that they allege that the NJDEP Defendants intentionally discriminated against the SCCIA Plaintiffs in violation of § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as well as 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment; (2) grant the NJDEP Defendants' motion to dismiss the Second Count of the Second Amended Complaint, as well as that portion of the Third Count of the Second Amended Complaint which alleges a violation of § 602 of Title VI; (3) grant the NJDEP Defendants' motion to dismiss the Fourth Count of the Second Amended Complaint, which alleges that the NJDEP Defendants violated the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.;* (4) deny SLC's motion to dismiss the Fifth Count of the Second Amended Complaint, which alleges a claim of private nuisance; and (5) grant SLC's motion to dismiss the Sixth Count of the Second Amended Complaint, which alleges a claim of public nuisance. The Court will enter an appropriate form of order.

ORDER

This matter having come before the Court on the Motions of Defendants to Dismiss the Second Amended Complaint for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), Olga D. Pomar, Esq., South Jersey Legal Services, Inc., Jerome Balter, Esq., Michael Churchill, Esq., Public Interest Law Center of Philadelphia, and

Luke W. Cole, Esq., Center on Race, Poverty and the Environment,

appearing on behalf of Plaintiffs, South Camden Citizens in Action, Geneva Sanders, Pauline Woods, Barbara Pfeiffer, Julita Gilliard, Oscar Lisboa, Phyllis Holmes, Gwen Peterson, Latoya Cooper, Julio Lugo, Lula Williams, and Sharon Christie Potter; Peter C. Harvey, Esq., Acting Attorney General of New Jersey, and Stefanie Brand, Esq., John M. Van Dalen, Esq., Deputies Attorney General, appearing on behalf of Defendants, the New Jersey Department of Environmental Protection and Bradley M. Campbell, Commissioner of the New Jersey Department of Environmental Protection; and Brian S. Montag, Esq., Catherine A. Trinkle, Esq., Mary E. Storella, Esq., Kathryn E. Tagliareni, Esq., KIRKPATRICK & LOCKHART, LLP, appearing on behalf of the Defendant–Intervenor, St. Lawrence Cement Co., LLC; and,

The Court, having considered the briefs of the parties;

For the reasons set forth in the OPINION filed concurrently with this ORDER, IT IS on this 16th day of April, 2003, hereby ORDERED that:

1. The Motion of Defendants, the New Jersey Department of Environmental Protection and Bradley M. Campbell, Commissioner of the New Jersey Department of Environmental Protection, to dismiss the First and Third Counts of the Second Amended Complaint, to the extent that they allege that the Defendants intentionally discriminated against Plaintiffs in violation of § 601 of Ti-

tle VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as well as 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment, is denied; and,

2. The Motion of Defendants, the New Jersey Department of Environmental Protection and Bradley M. Campbell, Commissioner of the New Jersey Department of Environmental Protection, to dismiss the Second Count of the Second Amended Complaint, as well as that portion of the Third Count of the Second Amended Complaint which alleges a violation of § 602 of Title VI, is granted; and,

3. The Motion of Defendants, the New Jersey Department of Environmental Protection and Bradley M. Campbell, Commissioner of the New Jersey Department of Environmental Protection, to dismiss the Fourth Count of the Second Amended Complaint, which alleges that the Defendants violated the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.*, is granted; and,

4. The Motion of Defendant–Intervenor, St. Lawrence Cement Co., LLC, to dismiss the Fifth Count of the Second Amended Complaint, which alleges a claim of private nuisance, is denied; and,

5. The Motion of Defendant–Intervenor, St. Lawrence Cement Co., LLC, to dismiss the Sixth Count of the Second Amended Complaint, which alleges a claim of public nuisance, is granted.